In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2688

DONNA VALENTINE,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, a municipal corporation,
JOHN TOMINELLO, MIKE DITUSA, and JOSEPH SENESE,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CV 2918—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED MAY 3, 2006—DECIDED JUNE 27, 2006

Before FLAUM, *Chief Judge*, and EVANS and WILLIAMS,
*Circuit Judges.*

FLAUM, *Chief Judge.* Plaintiff-Appellant Donna Valentine
("Plaintiff" or "Valentine") worked in the City of Chicago's
Department of Transportation ("CDOT") as a motor truck
driver. She alleges that she was sexually harassed by a co-
worker, John Tominello and that her supervisors took no
action in response to her complaints. Valentine filed suit
against the City, Tominello, and her two alleged supervi-
sors, Mike DiTusa and Joseph Senese. Valentine's com-
plaint alleged a Title VII violation, an Equal Protection
claim, and various state law claims. The district court

granted summary judgment in favor of Defendants and Valentine appeals. For the following reasons, we affirm in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.

## I. Background

Valentine worked in the Chicago Department of Transportation as a motor truck driver. From 1998 through November 2002, she was assigned to the department's Bosworth Yard location. During the time relevant to this appeal, Defendant Senese held the title of Acting General Foreman of CDOT.

Defendant Mike DiTusa was the Lot Supervisor at Bosworth Yard. His direct supervisor was Senese. DiTusa oversaw the 45 to 50 drivers assigned to his lot and was responsible for making sure trucks were serviced, starting trucks in the morning, assigning trucks to drivers, keeping records of when drivers signed in and out for work, addressing workplace disputes, and reporting problems to his superiors. DiTusa parked his car in the spot marked reserved for the supervisor and had his own office in the trailer at Bosworth Yard. Valentine alleges that most drivers would go to DiTusa if they had problems in the yard. She also alleges that DiTusa had the power to transfer drivers to different yards and had exercised this power in the past.

Defendant Tominello was a driver at the Bosworth Yard location, beginning in March 2002. According to Valentine, Tominello had a history of sexually harassing female co-workers. Plaintiff alleges that Tominello was transferred to Bosworth Yard after a woman at his previous assignment, Elizabeth Farrell, complained that he was sexually harassing her. Farrell alleged that she complained to Senese about Tominello, but did not receive a satisfactory response. Senese did not make a supervisory referral to the City's

Sexual Harassment Office ("SHO") about Farrell's complaints, and SHO recommended that Senese be counseled for his failing to do so. Another woman at Tominello's previous assignment, Colleen Julian, filed a statement in Farrell's case stating that Tominello also sexually harassed her. Julian asserted that Senese was aware of the harassment and that he told Tominello to stop. Senese eventually transferred Tominello to the Bosworth Yard location.

Valentine alleges that Tominello began harassing her as soon as he began working at Bosworth Yard. Specifically, according to Valentine, Tominello told her, "Your ass looks really great in those jeans you got on." She also maintains he told her she had a "nice ass," that it "would look good on his face," and that T-shirts she wore made her "tits look really nice" and bigger than normal. Additionally, Valentine alleges that in June or July 2002, Tominello told her that he was going to Chinatown to get his "pipes cleaned," while making a stroking motion with his hand. He also allegedly asked Valentine on approximately twenty occasions to leave her fiancé and go out with him, because he could show her a better time, and asked her between thirty and forty times to go out to dinner with him. Valentine further alleges that Tominello rubbed his crotch in front of her on nearly every work day from March 2002 to September 2002. Additionally, Valentine alleges that on at least six occasions Tominello caressed her arm or shoulder.

Valentine maintains that she told Tominello two to three times a week "that she did not care for him, and to just pretend that she didn't exist, to stay away from her, and to leave her alone." According to Valentine, she complained to DiTusa about Tominello's harassment on approximately ten occasions. After each complaint, DiTusa told Valentine that he would address the problem. DiTusa talked to Tominello on ten occasions and told him to leave Valentine alone. Nonetheless, the harassment continued. DiTusa did not refer Valentine's complaint to SHO. The City's policy on

sexual harassment provides that an employee may bring complaints of sexual harassment to a supervisor and a supervisor who receives such a complaint is required to refer it to SHO.

Valentine also alleges that DiTusa was present on one occasion when Tominello harassed her. According to Plaintiff, on September 25, 2002, she went into the trailer where DiTusa's office and a break room for the drivers were located. Valentine states that she entered DiTusa's office and sat near his desk. Another worker had brought a plate of white powdered crescent-shaped cookies to work that morning. The plate was sitting on DiTusa's desk. Valentine alleges that Tominello took one of the cookies, walked toward her, and said "let's see if we can get some sugar on Donna." She states that "Tominello held the cookie by the edge and made a jerking motion with his hand as if he were masturbating," and powdered sugar landed on Valentine's lap. Valentine asserts that she became angry and yelled at Tominello, and Tominello threatened to file a violence in the workplace complaint against her. After the incident, she left the trailer, got in her truck, and left the yard to begin work for the day.

Valentine alleges that she returned to the yard around 2:30 that afternoon and "saw wet chewed cookie spit on the driver's side window of her car." Valentine's car was parked in a fenced area that is secured by watchmen 24 hours a day. Valentine states that she went to DiTusa's office and complained about the vandalism. She said she thought Tominello was responsible for it. DiTusa allegedly told Valentine that unless she could prove it, there was nothing he could do. Valentine then returned to her car, where she says she "found a plastic penis under the windshield wiper."

Later the same day, Valentine called Senese to complain about Tominello's harassment. Senese transferred Tominello to another job site the next day, September 26,

2002. Senese reported the harassment to SHO. Valentine told DiTusa that she had complained to Senese. DiTusa allegedly responded, "now you have done it, now you are going to bring heat on all of us, you are going to make trouble where there doesn't need to be trouble."

On October 25, 2002, Valentine was in the trailer with DiTusa and allegedly overheard him talking on the phone to Senese about the September 25 "cookie incident." According to Valentine,

> DiTusa was telling Senese the name of the drivers who witnessed the incident with the powdered cookie on September 25, 2002. DiTusa told Senese, "Alright, I'll come pick up the papers for them." DiTusa then hung up the phone and abruptly stood up, yelling "Mother fucker, I don't need this shit," while throwing his desk chair into the wall. DiTusa walked past Plaintiff, paced around the common area of the trailer, swearing loudly. He returned to the office and glared at Plaintiff. Plaintiff feared for her safety.

Valentine maintains that after she filed her complaint at SHO, she noticed that her male co-workers would not speak to her and would leave the trailer when she entered it. Someone allegedly left a message on her cell phone saying, "Bitch, you better not do it." Also, Anthony Moreno, the Supervisor of Laborers, allegedly called Valentine a "rat." On two occasions at the end of October, Valentine met with Jay Sparber, a counselor for the City's Employee Assistance Project. Valentine maintains that she spoke with Sparber because of the fear and anxiety Tominello and her co-workers had caused her.

Valentine subsequently requested a transfer from the Bosworth Yard, allegedly because she felt it was a hostile work environment. She was transferred to the O'Hare yard in November 2002. She later requested to be moved out of the Department of Transportation altogether. In

April 2003, she was transferred to the City's Water Department.

On April 30, 2003, Valentine filed suit against the City of Chicago, Tominello, DiTusa, and Senese, alleging sexual harassment and hostile work environment claims under Title VII (against the City only), sexual harassment and retaliation in violation of her Equal Protection and First Amendment rights (against the City, Tominello, DiTusa, and Senese), and several state law tort claims.

Valentine retained Dr. Louise Fitzgerald, a professor at the University of Illinois and an expert in sexual harassment. Fitzgerald developed a report critiquing the City's sexual harassment policy. According to the report, the City's sexual harassment policy was not displayed or easily accessible to employees and employees did not have easy access to the names and telephone numbers of sources to contact if they experienced harassment. The report concluded that the City's sexual harassment policy "was inadequate, ambiguous, and inadequately publicized." Fitzgerald also opined that the City's response to previous sexual harassment complaints made against Tominello was inadequate; the City simply moved him to another location.

Defendants filed a motion for summary judgment on all of Valentine's federal claims. The district court granted Defendants' motion in full. The district court did not address Valentine's state law tort claims, finding that they should be raised in state court because all the federal claims were dismissed. Valentine appeals the district court's judgment as to her Title VII claim and her sexual harassment Equal Protection claim.

## II. Discussion

We review the district court's grant of summary judgment de novo, viewing the facts and drawing all inferences in the light most favorable to Valentine, the nonmoving party. *Scaife v. Cook County*, 446 F.3d 735, 738 (7th Cir. 2006).

### A. Title VII

In order to establish a prima facie case of hostile environment sexual harassment under Title VII, Valentine was required to show that:

> (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability.

*Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998).

### 1. Notice

The district court found that Valentine did not prove the fourth element of her claim—a basis for employer liability. According to the district court, Valentine did not put the City on notice of Tominello's alleged harassment until September 25, 2002, at which time the City responded appropriately to her complaint.

### a. Senese

The district court found that Senese responded properly to Valentine's complaint by transferring Tominello to a different yard the day after Valentine complained to him about the September 25, 2002, "cookie incident." The district court determined that there was no evidence that Senese was aware of misconduct by Tominello prior to September 25, 2002.

Valentine argues that Senese was on notice of her harassment prior to September 25, 2002, because he was aware that other women who had worked with Tominello had complained that he sexually harassed them. The record shows that Elizabeth Farrell complained to Senese about Tominello, that Senese failed to report Farrell's complaint to SHO, and that he was reprimanded for this failure. Senese was also aware Tominello had been accused by another female co-worker, Colleen Julian, of sexual harassment. In response to Julian's complaints, Senese had moved Tominello to the Bosworth Yard. Valentine argues that because Senese knew of Tominello's record, he should have recognized that Tominello would continue to sexually harass female employees at the Bosworth Yard location.

We agree with the district court that Valentine has failed to demonstrate that Senese was on notice that she was being harassed prior to her September 25, 2002, complaint. This was the first time Valentine complained to Senese about Tominello, and Senese transferred Tominello out of the Bosworth Yard the following day. Although Senese was aware that Tominello had been accused of sexually harassing female co-workers in the past, this is insufficient to show that Senese was aware that Tominello's bad behavior had continued.

### b. DiTusa

#### i. Power to transfer

The district court determined that Valentine's complaints to DiTusa were insufficient to put the City on notice that she was being harassed by Tominello, because DiTusa was not Valentine's supervisor. According to the district court, DiTusa was not Valentine's supervisor for purposes of Title VII because he: 1) did not receive any more pay than the other motor truck drivers; 2) did not have authority to hire employees; 3) did not have authority to terminate, promote, or demote employees; 4) did not "evaluate Plaintiff's work performance in any way"; 5) occasionally drove trucks on assignments himself; and 6) did not have authority to transfer employees out of CDOT. The district court also found that DiTusa did not have authority to transfer an employee to another yard within CDOT, because Valentine "admitted during her deposition that she has no basis other than her own personal belief that DiTusa in fact transferred other employees to other yards."

Valentine argues that there is a material question of fact as to whether DiTusa was her supervisor. She asserts that DiTusa managed the 45 to 50 drivers at the Bosworth Lot, held the title of Lot Supervisor, and believed himself to be a supervisor. Valentine also points out that DiTusa admitted in his Local Rule 56.1(a)(3) statement of uncontested facts that he had power to transfer individuals between various yards within CDOT. According to Valentine, the district court erroneously found that her testimony that DiTusa had the power to transfer employees was "her own speculation," because in fact her testimony was based on personal knowledge and was supported by DiTusa's own statements.

We agree with Valentine that there is a material question of fact as to whether DiTusa should be considered her supervisor for Title VII purposes. "[T]he essence of supervi-

sory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, *transfer*, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes of imputing liability to the employer." *Parkins*, 163 F.3d at 1034 (emphasis added).

In this case, Valentine has presented evidence that DiTusa had power to transfer employees between lots within CDOT. The district court erroneously concluded that the only evidence on this point was Valentine's own speculation. In fact, Defendants admitted that DiTusa has power to transfer individuals between yards, although he does not have power to transfer employees out of CDOT. Specifically, Defendants stated in their Local Rule 56.1(a)(3) statement of uncontested facts:

> 56.1(a)(3) Statement No. 42: Further, *DiTusa* had no authority to transfer anyone out of the Department of Transportation, and *could only transfer people yard to yard within the Department of Transportation.* (Emphasis added.)

Clearly, this is not a hearsay statement by Valentine—it is an admission by the City.

Accepting for the sake of argument that it made this admission, the City argues that Valentine waived the argument by failing to make it in her opening or reply brief. We cannot accept the City's position. In at least two places in her opening brief, on pages 18 and 23, Valentine cited to the exact page of the record containing the above-quoted statement. Thus, there is at least a material question of fact regarding whether DiTusa has the power to transfer employees and, in turn, whether DiTusa was Valentine's supervisor for purposes of Title VII.

Finally, we are unpersuaded by the City's argument that even if DiTusa did have authority to transfer employees,

this "marginal discretion" over Valentine's work is insufficient to impute Title VII liability to the City. Defendants rely on *Hall v. Bodine Electric Co.*, 276 F.3d 345 (7th Cir. 2002), for this proposition. There, the Court found that the defendant harasser was not a supervisor where he "(1) possessed the authority to direct [the plaintiff's] work operations (i.e., which machines she ran); (2) provided input into her performance evaluations, and (3) was charged with training her and other less experienced employees." *Id.* at 355. The Court concluded that there "is nothing in the record indicating that Bodine entrusted him with the authority to 'hire, fire, demote, promote, *transfer*, or discipline'" the plaintiff. *Id.* (emphasis added). The present case is distinguishable because Valentine has presented evidence that DiTusa had the power to transfer employees. As this Court has held, the ability to transfer employees is the ability to affect the terms and conditions of employment. *See Parkins*, 163 F.3d at 1034.

### ii. City policy on reporting sexual harassment

The district court concluded that no reasonable trier of fact could find that Valentine thought DiTusa was the proper person to complain to about sexual harassment. The district court emphasized that in March 2000, Valentine attended a Workplace Training Session at which she received "the telephone number and the address of the City's Sexual Harassment Office." Therefore, according to the district court, Valentine was on notice that she should bring any complaints of sexual harassment to SHO, not her supervisor.

Valentine argues that she reasonably believed that DiTusa was the proper person to whom she should report incidents of sexual harassment. Valentine maintains that "[t]he City's sexual harassment policy provides its employees with the option of reporting complaints to 'a

supervisor in the complainant's department.'" But, according to Valentine, the policy "fail[s] to identify who is the supervisor in [her] department." Valentine asserts that she reasonably concluded that DiTusa was an appropriate person with whom to lodge complaints, and the City should be imputed with knowledge of her harassment. Additionally, when Valentine complained to DiTusa about the harassment, he told her that he would take care of the problem. Valentine argues that "DiTusa's acquiescence to resolving the sexual harassment problems further provides a reasonable basis for Plaintiff's belief" that he was her supervisor.

We agree with Valentine that there is sufficient evidence showing that she reasonably believed that DiTusa was the appropriate person to contact with complaints of sexual harassment. The fact that Valentine had contact information for SHO does not demonstrate that she was on notice that the only way she could report harassment was to bring a complaint to SHO. Indeed, that is not the case. The City's sexual harassment policy also provides that an employee can choose to bring complaints to a supervisor within his or her department. The policy does not identify a supervisor for each department. Given the level of day-to-day supervision DiTusa had over Valentine and other employees at Bosworth Yard, a reasonable juror could conclude that Valentine reasonably thought that DiTusa was the appropriate point person. This is especially so because Senese worked on the other side of the City and had no day-to-day contact with Valentine.

### iii.  Valentine's complaints

Valentine stated that she told DiTusa that Tominello was "aggravating [her], that he was being rude, [and] that he had put his hands on [her]." Defendants argue that these complaints were insufficient to notify DiTusa that Valentine

was being sexually harassed, citing our recent decision in *Velez v. City of Chicago*, 442 F.3d 1043 (7th Cir. 2006). The district court did not pass on this issue, instead basing its decision on the finding that DiTusa was not Valentine's supervisor for purposes of Title VII.

As we stated in *Velez*, "a successful hostile work environment claim requires a plaintiff to demonstrate that the harassment was *based on* his or her protected status." *Id.* at 1048. We agree with Defendants that Valentine's first two complaints—that Tominello was "aggravating" and "rude"—are not, taken alone, sufficient to show that DiTusa was on notice of the sexual harassment. A jury could find, however, that Valentine's complaint that Tominello "put his hands on" her—when taken in conjunction with her complaints that he was "aggravating" and "rude"—is sufficient to show that DiTusa was on notice. The complaint about unwanted touching serves as "evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Parkins*, 163 F.3d at 1035 (quoting *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996)). *Cf. Zimmerman,* 96 F.3d at 1017 (finding that a complaint by a female employee to her supervisor that she was afraid of a male co-employee's "political clout" was not sufficient to put the employer on notice that she was being sexually harassed by the co-employee). This is especially true in the context of this case, where Valentine was one of only a handful of women working in a traditionally male workplace.[1]

---

[1] There is additional evidence in the record demonstrating that DiTusa recognized that Valentine was complaining about sexual harassment. DiTusa testified that he was aware Tominello was transferred to the Bosworth Yard because he had been accused of sexual harassment at his previous placement. Unfortunately, Valentine failed to cite this evidence in her opening or reply brief.

(continued...)

Additionally, we are unpersuaded by Defendants' argument that the six instances of touching complained of by Valentine were "too tepid to make out a case of sexual harassment." Defendants rely on *Adusumilli v. City of Chicago*, 164 F.3d 353 (7th Cir. 1998), in support of this argument. In that case, we found that the plaintiff was not subjected to an objectively hostile work environment where she complained of "no more than teasing about waving at squad cars, ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks." *Id.* at 361. The focus in *Adusumilli* was different than in the present case: it was on whether instances of touching were enough to demonstrate that a work environment was objectively hostile, not on whether complaints about touching were sufficient to put an employer on notice of sexual harassment. Thus, while the six instances of touching complained of by Valentine may not, by themselves, be enough to show an objectively hostile work environment for purposes of Title VII, Valentine's complaints about the unwanted touching could be enough to show DiTusa knew there was some probability that Valentine was being sexually harassed. We therefore find that there is a material question of fact as to whether DiTusa was on notice of the harassment.

---

[1] (...continued)

Instead, she introduced the evidence as part of a motion to supplement the record, filed in response to questions raised at oral argument. This proffer comes too late. Just as arguments raised for the first time at oral argument are waived, *Szczesny v. Ashcroft*, 358 F.3d 464, 465 (7th Cir. 2004), so too are arguments made in supplemental filings following oral argument.

### 2. Hostile work environment

Because it rested its decision on the finding that Valentine had not properly notified the City of her harassment, the district court did not consider whether Tominello's actions were sufficiently severe to constitute a hostile work environment. However, **"**[w]e may affirm a district court's judgment on alternate grounds found in the record." *Cont'l Ins. Co. v. M/V ORSULA*, 354 F.3d 603, 606 (7th Cir. 2003).

Defendants argue as an alternate ground for affirmance that the harassment Valentine alleges to have suffered was insufficient to amount to a hostile work environment. Defendants accept Valentine's allegations as true, but argue that at most Tominello's conduct was "inappropriate, boorish, and crass." According to Defendants, although Tominello's requests to Valentine for dates were frequent, they were not physically threatening. And although Valentine found the six occasions on which Tominello touched her to be creepy and sexual, the contact was infrequent and with body parts that are not conventionally viewed as sexual.

Additionally, Defendants note that the Bosworth Yard "is an environment where vulgarity is common" and Valentine admitted that she was not bothered by this. Defendants maintain that Valentine admitted that Tominello's conduct did not affect her ability to do her job or cause her to feel humiliated. Valentine only saw Tominello for approximately 30 to 60 minutes a day, when drivers swiped in and out of work. Finally, Defendants maintain that Valentine's complaints of sleeplessness, headaches, anxiety attacks, nausea, and weight loss are irrelevant to her Title VII claim because "she linked these complaints solely to her First Amendment retaliation claim, which she has waived on appeal."

There is no bright-line test for determining when a workplace becomes objectively hostile. There are, however, a number of factors courts must consider, "including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975-76 (7th Cir. 2004). In the case of discriminatory statements, "we must assess the frequency of their use, as well as whether the remarks were stated directly to the plaintiff or whether the plaintiff heard them secondhand." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) (internal citations omitted).

Evaluating these factors, we find that Valentine has raised a genuine issue of material fact as to whether she was subjected to a hostile work environment. Valentine alleged that Tominello's harassment was very frequent: he rubbed his crotch in front of her nearly every day; asked her on twenty occasions to leave her fiancé; asked her on dates between 30 and 40 times; made repeated comments about her "tits" and "ass"; and on six occasions rubbed Valentine's arm or shoulder. Valentine also alleged that Tominello's behavior was humiliating. For instance, the "cookie incident" of September 25, 2002, occurred in front of Valentine's co-workers, including DiTusa. Valentine admits that she viewed this incident as the last straw and became angry and yelled at Tominello. When Valentine confronted Tominello is this manner, he threatened to file a violence in the workplace complaint against her. All of this evidence, taken as true, supports Valentine's claim that she was subjected to severe and pervasive sexual harassment.

Because Tominello's alleged conduct was so frequent and aimed directly at Valentine, this case is distinguishable from other recent cases in which we have found that a work environment was not objectively hostile. For instance, in *Whittaker v. Northern Illinois University*, 424 F.3d 640 (7th

Cir. 2005), we found that a male supervisor who invited a female employee on two occasions to join him on his boat for "a weekend of drinking and other things" and made sexual comments to co-workers outside of the plaintiff's presence had not created a hostile work environment. *Id.* at 645-56. In *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675 (7th Cir. 2005), we found that a co-worker who used vulgar language in front of plaintiff, occasionally cursed and yelled at her, and made isolated comments about older women in the workplace did not create a hostile work environment. *Id.* at 678. Here, by contrast, Tominello allegedly made comments or gestures directly to Valentine on a nearly daily basis and touched her on half a dozen occasions.

Valentine has also raised a question whether the workplace was subjectively hostile. Valentine alleges that she told Tominello two to three times per week to leave her alone and that she was not interested in him. Contrary to Defendants' assertions, Valentine stated below that she experienced anxiety, inability to concentrate, and depression as a result of Tominello's harassment. She stated that these problems began occurring *before* the "cookie incident," immediately after which Tominello was transferred to another yard. Finally, Dr. Fitzgerald's report, which concludes that Valentine suffered from emotional trauma because of the harassment, supports Valentine's claim. In sum, we find that Plaintiff has raised a genuine issue of material fact as to her Title VII claim against the City.

**B. Equal Protection**

Sexual harassment by a state employer constitutes sex discrimination in violation of the equal protection clause. *Bohen v. City of East Chi.*, 799 F.2d 1180, 1185 (7th Cir. 1986). As we explained in *Bohen*,

> Creating abusive conditions for female employees and not for male employees is discrimination. Forcing women and not men to work in an environment of sexual harassment is no different than forcing women to work in a dirtier or more hazardous environment than men simply because they are women. Such unjustified unequal treatment is exactly the type of behavior prohibited by the equal protection clause[.]

*Id.* Victims of sexual harassment by a state employer or employee can seek redress under § 1983 of the Civil Rights Act, 42 U.S.C. § 1983.

**1. Color of state law**

When an equal protection claim is brought against an individual state employee, the plaintiff must show that the individual was acting under color of state law. "Action is taken under color of state law when it involves a misuse of power, 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' As a result, acts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office." *Honaker v. Smith*, 256 F.3d 477, 484-85 (7th Cir. 2001) (quoting *Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 413 (7th Cir. 1997)). The district court found that Valentine failed to show that any of the three individual Defendants acted under color of state law. On appeal, Valentine does not challenge the district court's finding as to Tominello. Thus, our opinion considers only Senese and DiTusa.

### a. Senese

The district court found that Senese did not act under color of state law because he was not a supervisor for § 1983 purposes. Even if Senese was a supervisor, the district court reasoned, he acted appropriately in responding to Valentine's complaint.

Valentine maintains that it is undisputed that Senese was a supervisor: he was Acting General Foreman of CDOT, and SHO had recommended that he be disciplined after he failed to make a supervisory referral to SHO when Elizabeth Farrell complained to him that Tominello was harassing her. Valentine also argues that Senese need not be a supervisor to be acting under color of state law—the relevant inquiry is whether the defendant is clothed with the authority of state law.

We find that there is a material question of fact as to whether Senese acted under color of state law. The City admitted in its statement of undisputed facts that Senese was a supervisor of motor truck drivers at various CDOT yards, including the Bosworth Yard. Senese made work assignments for drivers and had the ability to transfer employees, which he did when Valentine complained to him about the "cookie incident." Additionally, the action that Valentine complains of—Senese's decision to transfer Tominello to the Bosworth Yard after he received complaints from female coworkers about Tominello's harassment—was undertaken while Senese was exercising his responsibilities as foreman.

### b. DiTusa

The district court found that DiTusa did not act under color of state law because he was not Valentine's supervisor for § 1983 purposes. Valentine argues that there is a material question of fact as to whether DiTusa was a

supervisor with authority and control over Valentine, as explained above in relation to her Title VII claim.

We agree with Valentine that there is a question of material fact as to whether DiTusa is a supervisor. There is evidence that he had the power to transfer employees out of Bosworth Yard. Also, Valentine and the other drivers at the yard commonly brought work problems to DiTusa for resolution. DiTusa was acting under color of state law because he was exercising his responsibilities as Yard Supervisor when he took Valentine's complaints about Tominello, talked to Tominello about the complaints, and decided not to report or transfer Tominello.

## 2. Intent

"[A] a plaintiff can make an ultimate showing of sex discrimination either by showing that sexual harassment that is attributable to the employer under § 1983 amounted to intentional sex discrimination or by showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination." *Bohen*, 799 F.2d at 1187.

### a. Senese

The district court found that there was no evidence Senese intended to harass Valentine or condone the harassment by Tominello. The district court emphasized that as soon as Valentine complained to Senese, he transferred Tominello to a different yard. The district court also was "not persuaded that Senese can reasonably be deemed to have turned a blind eye to the alleged harassment against Valentine simply because Senese knew that there had been a prior complaint against Tominello made by another employee." Valentine argues that Senese condoned the

harassment because he knew that Tominello had harassed women in the past and had taken no action other than transferring him.

We find that while Senese may have acted negligently, there is no evidence that he condoned Tominello's harassment of Valentine. Indeed, there is no evidence that he was even aware of it until Valentine called him following the "cookie incident." There is no evidence that Senese predicted that Tominello would harass Valentine when he was transferred to Bosworth Yard.

### b. DiTusa

The district court found that Valentine's "vague contention that she complained to DiTusa and that the harassment continued is insufficient to show intent."

We find that there is a material question of fact as to whether DiTusa intentionally condoned Tominello's harassment of Valentine. Valentine complained to DiTusa about Tominello on approximately ten occasions. Each time, DiTusa told her he would take care of the problem. Each time, he went to Tominello and told him to stop. A reasonable juror could find under these circumstances that DiTusa's response was obviously inadequate, and DiTusa was aware that to prevent the harassment he would have to take more severe action against Tominello, such as reporting him or transferring him. Additionally, when Valentine told DiTusa that she had complained to Senese, DiTusa allegedly told her, "now you have done it, now you are going to bring heat on all of us, you are going to make trouble where there doesn't need to be trouble." Later, when DiTusa was required to give Senese names of drivers who had seen the "cookie incident," DiTusa became very angry, throwing his chair against the wall and screaming profanities. A juror could infer from this evidence that DiTusa had consciously chosen not to protect Valentine from Tominello's

advances, and was angry when Valentine took matters into her own hands. Thus, there is a material question of fact as to whether DiTusa intentionally discriminated against Valentine.

### 3.  Custom, policy or practice

"Under § 1983, actions of a state entity's employees are attributed to the state entity itself if those actions are in furtherance of the entity's 'policy or custom.'" *Bohen*, 799 F.2d at 1188. "Under our case law, unconstitutional policies or customs can take three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003).

In this case, the district court found that Valentine failed to show that the City had an express policy or practice that encouraged or condoned harassment, that any City employee with policymaking authority was involved in the alleged harassment, or that sexual harassment was a widespread practice in CDOT.

Valentine argues that she has submitted sufficient evidence that the City had a custom or practice of failing to adequately address sexual harassment complaints by its female employees. Valentine maintains that the City's sexual harassment policy is ineffective, in part because SHO has no authority other than to investigate and recommend. Additionally, the City allowed Tominello, a known harasser (according to complaints by two women, Farrell and Julian), to be transferred to a yard where women worked and did not monitor his actions once he was transferred.

We find that Valentine has failed to show that it was the City's policy or custom to condone sexual harassment of women. Valentine does not allege that the City has an express policy condoning sexual harassment. Nor does Valentine argue that her constitutional injury was caused by a person with final policymaking authority, because Senese and DiTusa, the persons whom Valentine accuses of responding to her complaints inappropriately, do not have any policymaking authority.

Valentine instead focuses on the third type of unconstitutional policy or custom, "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Rasche*, 336 F.3d at 597. Valentine has presented insufficient evidence of a widespread practice by the City to condone sexual harassment. As Defendants point out, all of Valentine's allegations relate to one harasser—Tominello; and two supervisors—Senese and DiTusa. Plaintiff admits that Senese responded to her complaint about Tominello almost immediately, reporting him to SHO and transferring him to another job site. Under this Circuit's case law, these allegations are insufficient to demonstrate that the City has a custom or practice of condoning sexual harassment. *See, e.g., Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) (finding that the plaintiff failed to show that "the City had a custom of erroneously denying to vehicle owners that their vehicles were at" a certain impound lot, where the plaintiff only offered three examples of when such denials had occurred).

Finally, the record shows that the City responded to complaints of sexual harassment once the complaints made it to SHO. Supervisors are required by City policy to report complaints of sexual harassment to SHO, and when Senese failed to do so when Elizabeth Farrell complained about Tominello, he was counseled for his failure.

Additionally, in both Valentine's and Farrell's cases (Julian did not go to SHO), SHO investigated the complaint and the City suspended Tominello without pay for nearly a month. Although Valentine may view these sanctions as insufficient, they demonstrate that the City does not have a widespread practice of condoning sexual harassment.

## III.  Conclusion

For the foregoing reasons, we REVERSE the district court's grant of summary judgment for the City on Valentine's Title VII hostile work environment sex discrimination claim. We AFFIRM the district court's grant of summary judgment for the City, Tominello, and Senese on Valentine's § 1983 equal protection claim. We REVERSE the district court's grant of summary judgment for DiTusa on Valentine's § 1983 equal protection claim. The case is REMANDED for further proceedings consistent with this opinion. Circuit Rule 36 shall apply.

No. 05-2688

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*