Georgia ERICKSON, Plaintiff–
Appellee,

v.

WISCONSIN DEPARTMENT OF
CORRECTIONS, Defendant–
Appellant.

No. 05–4516.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 6, 2006.

Decided Nov. 14, 2006.

Beth Eyster Shore, Brennan, Steil & Basting, Janesville, WI, Robert J. Kasieta (argued), Madison, WI, for Plaintiff–Appellee.

Richard Briles Moriarty (argued), Office of the Attorney General Wisconsin Department of Justice, Madison, WI, for Defendant–Appellant.

Before ROVNER, EVANS, and SYKES, Circuit Judges.

EVANS, Circuit Judge.

Georgia Erickson, a payroll and benefits specialist at the Wisconsin Correctional Center System (WCCS), a division of the Wisconsin Department of Corrections (WDC), brought suit against her employer under Title VII's hostile work environment doctrine and § 1983 after she was raped by John Spicer, an inmate at the Oregon Correctional Center (OCC). The OCC, an all-male minimum security prison also under the authority of WDC, is housed in the same building as WCCS. A jury ultimately found for Erickson, and the district court (Chief Judge Barbara B. Crabb) denied WDC's Rule 50 motion for judgment as a matter of law after concluding that "the evidence was sufficient to support the jury's verdict that [WDC's] agents knew of a significant risk of serious harassment, were in a position to take remedial action and failed to act to prevent the sexual harassment from occurring." WDC has appealed the denial of its Rule 50 motion.

We review *de novo* the district court's denial of WDC's motion for judgment as a matter of law. *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 578 (7th Cir.2003); *Filipovich v. K & R Express Sys.*, 391 F.3d 859, 863 (7th Cir.2004). We view the facts, however, in the light most favorable to Erickson. *Molnar v. Booth*, 229 F.3d 593, 597 (7th Cir.2000). We must determine "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Mack v. Great Dane Trailers*, 308 F.3d 776, 780 (7th Cir.2002) (citations omitted). We will overturn the verdict only if no reasonable jury could have found in Erickson's favor. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1173 (7th Cir. 2002).

Erickson started working for WDC in 1996. She was a payroll and benefits specialist at WCCS between July 2001 and December 2001 (she had worked intermittently for WCCS for approximately 4 years prior to that time). In December 1997, Erickson successfully completed training sponsored by WDC regarding interactions between inmates and nonsecurity employees. The 3–day training stressed that male inmates often fantasized about female employees and that employees should take care not to be too friendly with inmates at the facility. WDC implemented this training in part because it understood the increased risk that male inmates posed to female employees. WCCS supervisors also testified at trial that they understood that "increased vigilance" of an employee by an inmate was a sign that an inmate might be planning to harm the employee.

Erickson worked long hours at her payroll and benefits position at WCCS. Her supervisors gave her permission to work flexible hours in order to complete her heavy workload. Erickson's supervisors also authorized her to work in the WCCS offices after 4:30 p.m., and Erickson often did. The doors to the WCCS offices were typically locked at 4:30 p.m. OCC, which housed the male inmates, was located directly across the hall from the WCCS offices. Most of the employees in the WCCS office where Erickson worked were female. The WCCS offices were off-limits to OCC inmates—except those few who had specific authority to be there.

One way for an inmate to get authorization to be in the WCCS office was to be assigned to work duty there. Inmates performed certain jobs at WDC, including the job of janitor at the WCCS offices. Inmate janitors did typical janitor sorts of things like emptying waste baskets and vacuuming floors. Because they had contact with nonsecurity employees at WCCS, OCC reviewed an inmate's file first to determine if a particular inmate should get the job. When OCC considered Jonathan Spicer for the job, his file contained certain pieces of negative information. For example, OCC often put inmates on work release as part of their rehabilitation program in order to help reintegrate them back into the community. Spicer had been put on work release but lost that status when he committed a major violation of work release rules: he was AWOL for 3 hours from an assigned workplace in February of 2001. Spicer was classified as a high-risk inmate as of December of 2001, and at least one social worker concluded that he only be put back in a work-release situation where he could be "closely monitored." The parole board denied Spicer's parole application in July of 2001 because he was an "unreasonable risk to the community." But many inmates probably have a certain amount of negative baggage, so OCC apparently thought Spicer was qualified for the inmate janitor position after it completed a review of his file. Spicer worked as an inmate janitor for around 7 weeks. His job ended, as we will see, on December 28, 2001.

Although OCC had no specific policy preventing inmate janitors from being in the WCCS offices after 4:30 p.m., Erickson does not recall ever seeing an inmate in or near her workspace after hours before Spicer appeared there on December 20, 2001. A coworker of Erickson also testified that Spicer typically completed his job between 10 and 11 a.m. and that when she saw Spicer in the WCCS offices on December 28 at 4:35 p.m., it struck her as very unusual. Andrea Bambrough, Human Resources Director, had never, before December 28, 2001, seen inmate janitors in the WCCS offices after 4:30 p.m.

On December 20, Erickson was at her cubicle in the WCCS offices finishing up her work for the day. Her supervisors had invited her earlier that day to an after-work party at a local bar, Hack's, for some "Christmas cheer." Some time between 4:45 p.m. and 5:15 p.m., Erickson, who thought she was alone in the office, turned around to find Spicer "fiddling with a vacuum" and looking back and forth between her and the vacuum in a way that made her very uncomfortable. Erickson testified about her shock at seeing Spicer there:

> I was, you know, working at my desk trying to finish up some things because I had the next day off as vacation ... but I needed to check something in somebody's file or something and I turned around in my chair and that is when I became aware that I wasn't alone like I thought I was. That there was an inmate there just looking like he was trying to look busy with a vacuum, and it really freaked me out. It scared me because as far as I understood, I never should have been left alone with an inmate. And I mean it's like he was—I felt like he was stalking me because he was looking at me and then would kind of look down a minute, too, and I didn't know, you know, what he had on his mind or anything. And I could remember from the training that they had talked about these prisoners and inmates fantasizing and I was scared. All I could think of was getting out of there.

Erickson immediately got out of her chair and told Spicer she had to leave to meet some friends. She left her desk in disarray, pointed Spicer out of the door, locked the door herself, and left. She then went directly to Hack's. The whole gang was there: Todd Johnson (assistant superintendent at OCC who had the ability to place or remove inmates from work assignments), Margaret "Mickey" Thompson (the warden at WCCS, who had primary responsibility for preventing sexual harassment there), Andrea Bambrough (director of human resources at WCCS and Erickson's supervisor), Wayne Mixdorf (sector chief), and Cindy Schoenike (sector chief). The first thing Erickson did when she arrived at the bar was tell the assembled group what happened:

> When I got there they were all at a table, the ones that I mentioned, and sat down, you know, took my coat off and then I, you know, told them what happened. I told them right away that I was, you know, freaked and scared because the inmate, that I didn't know his name,[1] but that the inmate was in there, in my work area, into my work area and that—I mean, that is mainly it. I just told them I was scared and really freaked. That he was monkeying around—he kind of looked like he was just monkeying around with a vacuum.

When asked "whether you communicated to them that you had come directly from work," Erickson testified: "Oh, yes, yes. I came right from work directly there. I think I might have even, you know, commented on how I just kind of didn't finish things and shut up things and closed up things and left." Erickson characterized her demeanor at the bar as "[s]cared and excited or, you know, kind of probably a little bit emotional." When the people at Hack's heard the story, according to Erickson, they seem surprised and "their mouths kind of dropped." Warden Thompson told Erickson that she was "so sorry" and that "they would make sure

---

1. There's no real question about the identity of the inmate Erickson was talking about. Johnson (the assistant superintendent at OCC) testified that he had a "mental image" of Spicer and knew he was "the assigned inmate" at the WCCS office.

nothing like this ever happened again." Erickson left the bar shortly after this discussion and did not return to work until December 27.

Erickson testified that, based on her conversation with her supervisors in the bar on December 20, she did not expect to see Spicer in the WCCS offices again: "I had, you know, told everybody at Hack's what had happened and they said they would make sure it would never happen again so I trusted that that meant it would never happen again period." On December 28, 1 day after her return to work and 8 days after their first encounter, Spicer appeared in the office again after hours. Erickson was again alone. This time he attacked and brutally raped her. He then escaped from the OCC in Erickson's car.

Neither Johnson nor Thompson, nor anyone else present at Hack's on December 20 for that matter, took any action regarding Spicer during the intervening week between December 20 and December 28. However, Johnson admitted at trial that, had he remembered what Erickson said about Spicer on December 20, he would have done something about him prior to December 28. But he didn't. And Johnson previously took action in a similar situation: when he received an earlier complaint from a female employee about a different inmate janitor's "too friendly" behavior, he removed the inmate from his position the same day.

■ At trial, Erickson brought her claim against WDC under Title VII's hostile work environment doctrine, alleging that WDC discriminated against her on the basis of her sex by failing to prevent the sexual assault by Spicer. For the purposes of Title VII liability, the WDC, Erickson's employer, is the only defendant. To establish that a hostile work environment exists, a plaintiff must present evidence from which a jury could reasonably conclude that she was 1) subjected to unwelcome sexual conduct, advances, or requests; 2) because of her sex; 3) that were severe or pervasive enough to create a hostile work environment; and 4) that there is a basis for employer liability. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir.2004); *Smith v. Sheahan*, 189 F.3d 529, 532–33 (7th Cir. 1999). WDC does not dispute that the sexual assault on Erickson met the first three requirements of a hostile work environment claim under Title VII. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir.2000) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430–31 (7th Cir.1995) (sexual assault creates an objectively hostile work environment)).

■ Rather, WDC argues that no reasonable jury could have found a basis for employer liability. Under Title VII, an employer's liability is determined by the status of the harasser and the type of injury caused by the harassment. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). One standard exists for harassment by supervisors and another for harassment by coworkers. The standard for supervisors is strict liability (*id.* at 765, 118 S.Ct. 2257), and the standard for coworkers is negligence (*id.* at 758–59, 118 S.Ct. 2257; *Williams v. Waste Mgmt. of Illinois*, 361 F.3d 1021, 1029 (7th Cir. 2004)). The greater the potential injury to the employee, the greater care the employer must take. *Baskerville v. Culligan Int'l Co.*, 50 F.3d at 432 ("Just as in conventional tort law a potential injurer is required to take more care, other things being equal, to prevent catastrophic accidents than to prevent minor ones, so an employer is required to take more care, other things being equal, to protect its female employees from serious sexual harassment

than to protect them from trivial harassment.") (citations omitted).

Although it is not clear that Spicer qualifies as a coworker of Erickson, the district court held that it was proper to evaluate Erickson's Title VII claim under the negligence standard. That position is supported by our decision in *Dunn v. Washington County Hospital,* 429 F.3d 689 (7th Cir.2005). *Dunn* holds that for purposes of Title VII hostile work environment liability based on negligence, whether the potential harasser is an employee, independent contractor, or even a customer is irrelevant: "The genesis of inequality matters not; what *does* matter is how the employer handles the problem." *Id.* at 691 (emphasis in original). This is because "[e]mployers have an arsenal of incentives and sanctions ... that can be applied to affect conduct" that is causing the problem. *Id.* As the district court noted, it can be easier for employers who run residential enterprises (as WDC did here) to use that arsenal of incentives and sanctions with their residents in order to avoid the creation of a hostile work environment. *See, e.g., Crist v. Focus Homes, Inc.,* 122 F.3d 1107, 1112 (8th Cir.1997) (in Title VII claim involving a private residential facility for autistic patients, the court focused on the facility's unique ability to address the conditions under which the harassment occurred); *Turnbull v. Topeka State Hosp.,* 255 F.3d 1238, 1244–45 (10th Cir.2001) (state mental hospital's residential environment was a factor in a finding of liability under Title VII when resident sexually assaulted psychologist). Our task on this appeal is to determine whether a reasonable jury could have found that WDC was negligent in addressing the risk that Spicer might sexually harass Erickson.

WDC argues that employer liability for negligence can only arise in a Title VII case if an employer has notice of actual prior acts of sexual harassment. Before that, according to WDC, no duty exists on the part of the employer to discover or remedy sexual harassment. WDC cites over 40 cases in our circuit to support this proposition. None of the cases, however, mirror the unusual facts that are present here. *See, e.g., Parkins v. Civil Constructors of Illinois, Inc.,* 163 F.3d 1027, 1036 (7th Cir.1998) (proper remedial action taken after notice of some problematic behavior given); *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 447 (7th Cir.1994) (same); *Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1146–47 (7th Cir.1997) (employee gave no information to employer about the alleged misconduct); *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1014 (7th Cir.1997) (same). WDC uses these cases to argue that Erickson would have had to notify her supervisors of past, unreported sexual harassment in order to trigger its obligation to prevent future sexual harassment.

This argument, we think, makes little sense. It would be futile for an employee, under WDC's proposed formulation, to report conduct that reasonably suggested that sexual harassment would occur in the future. In other words, if Erickson had come into Hack's and said "I think inmate Spicer will try to rape me when I come back to work next week," WDC had no duty to investigate unless it had evidence that Spicer had previously sexually harassed Erickson.

An argument of this sort runs counter to Title VII's "primary objective," which is "not to provide redress but to avoid harm." *Faragher v. City of Boca Raton,* 524 U.S. 775, 805–06, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). Employers need to take "all steps necessary to prevent sexual harassment from

occurring...." *Id.* at 806, 118 S.Ct. 2275 (quoting 29 C.F.R. § 1604.11(f) (1997)). Prevention can involve proactive steps such as constructing a reporting system for instances of sexual harassment, training employees about sexual harassment risks and what can be done to ameliorate them (as WDC did here), and taking reasonable steps to prevent harassment once informed of a reasonable probability that it will occur. The greater the potential harm to the employee, the more vigilant the employer needs to be.

■ The law of our circuit supports Title VII's goals by holding an employer liable under Title VII's negligence standard if it "failed to discover and prevent" sexual harassment of an employee giving rise to a hostile work environment. *Zimmerman v. Cook County Sheriff's Dep't,* 96 F.3d 1017, 1018 (7th Cir.1996); *Baskerville,* 50 F.3d at 432 (the employer's duty under Title VII is discharged "if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees"). Cases such as these are fact-specific and must be analyzed according to the totality of the circumstances. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Valentine v. City of Chicago,* 452 F.3d 670, 681 (7th Cir.2006); *Mack v. Great Dane Trailers,* 308 F.3d 776, 781 (7th Cir.2002). Before liability for sexual harassment can arise, the employee must give "the employer enough information to make a reasonable employer think that there was some probability that she was being sexually harassed." *Zimmerman,* 96 F.3d at 1019; *Baskerville,* 50 F.3d 428, 432; *Durkin v. City of Chicago,* 341 F.3d 606, 612 (7th Cir.2003). In other words, an employer who receives notice that some probability of sexual harassment exists must adequately respond to that information within a reasonable amount of time.

■ Under Title VII, an employer typically draws upon two sources of information in order to determine the risk of sexual harassment to an employee: information received directly from the employee, and the employer's knowledge of the specific context of its own working environment. Erickson's report on December 20 was the key source of information for WDC and demonstrated that Erickson was afraid enough to make an effort to articulate her concerns about Spicer to her supervisors. "Generally, we do not consider an employer to be apprised of the harassment 'unless the employee makes a concerted effort *to inform the employer that a problem exists.*'" *Rhodes v. Illinois Dep't of Transp.,* 359 F.3d 498, 506 (7th Cir. 2004) (emphasis added) (quoting *Silk v. City of Chicago,* 194 F.3d 788, 807 (7th Cir.1999)).

■ An employee's effort to bring a threat of potential sexual harassment to an employer's attention (like Erickson's effort at Hack's) can, under certain circumstances, be enough to give rise to liability. *Frazier v. Delco Electronics Corp.,* 263 F.3d 663 (7th Cir.2001), supports this position. In *Frazier,* a coworker threatened the life of a fellow coworker (after engaging in other harassment). The employer (Delco) argued that it shouldn't be liable for the acts of sexual harassment following the threat because it did not include any information about touching of the plaintiff or any sexual remarks. We observed "[i]t is true that the threat itself was not actionable; Delco did not violate Frazier's rights until it failed to take effective action to protect her against Spears. The threat, however, *provides the essential context* for appraising the gravity of the later acts of harassment". *Id.* at 668 (citation omitted) (emphasis added).

■ We must take into account the nature of the threat that Erickson relayed to her supervisors on December 20 when we evaluate WDC's failure to prevent the "later act[ ] of harassment"—here, the sexual assault. Erickson's fear was based on encountering a male inmate, alone and after hours, who stared at her in a way that made her very uncomfortable. Erickson had never before been alone with an inmate. She was unarmed and not in a guard's uniform. Her job description didn't require that she deal personally with men in custody or be alone with them, after hours, in her office. Spicer's actions "freaked her out" and he did not appear to be actually operating the vacuum. When Erickson told her supervisors about her encounter, they exhibited signs of concern (their "mouths dropped"). The warden told Erickson that she was "so sorry" and that "nothing like this would ever happen again." A reasonable jury could have found that Erickson's story about her unnerving encounter with Spicer presented an implicit threat of sexual harassment that put her supervisors on notice that there was some probability that "a problem" existed *(Rhodes,* 359 F.3d at 506) and a risk of sexual harassment was present. Johnson admitted at trial that had he remembered his conversation with Erickson between December 20 and December 28, he would have done something about the situation (as he had done when the earlier complaint about an inmate janitor was made). Employers are liable for hostile work environment harassment under the negligence standard when they "know[ ] or should know that wrongdoing is afoot and fail[ ] to take steps reasonably designed to stop it." *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 811 (7th Cir.2000).

Thompson's statement to Erickson that she was sorry and would make sure the event was not repeated supports this conclusion—why would Thompson respond this way if no problem existed? Similarly, Johnson's testimony that he would have done something about Spicer between December 20 and December 28 had he remembered suggests that he understood the implicit threat of sexual harassment Erickson had raised. *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 811 (7th Cir. 2000).

The supervisors also had, in addition to Erickson's report, specific information about the workplace environment at WCCS. That information lent support to Erickson's claim that she felt very uncomfortable when Spicer was in her workplace after hours. In *Valentine v. City of Chicago,* 452 F.3d 670, 680 (7th Cir.2006), the City argued that Valentine's complaint that her harasser was "aggravating" and "rude" and that he "put his hands on her" was too vague to put the city on notice of a danger of sexual harassment. We disagreed:

A jury could find, however, that Valentine's complaint that Tominello "put his hands on" her—when taken in conjunction with her complaints that he was "aggravating" and "rude"—is sufficient to show that [Valentine's supervisor] was on notice. The complaint about unwanted touching serves as "evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *This is especially true in the context of this case, where Valentine was one of only a handful of women working in a traditionally male workplace.*

*Id.* (citations omitted) (emphasis added). WDC knew, prior to December 20, that most of the office employees at WCCS were female; all of the inmates at OCC were male. Erickson's supervisors at WCCS knew before December 20 of an increased risk that male inmates might

sexually harass female employees. In fact, WDC implemented training (that Erickson completed) emphasizing that male inmates would fantasize about and attempt to establish inappropriate relationships with female employees. Erickson herself thought back to that WDC-sponsored training during her December 20 encounter with Spicer. Supervisors were also aware, before December 20, that unusual attention paid to a female employee by an inmate might suggest that the inmate posed a threat. And Spicer, who was previously classified as a high-risk inmate in the opinion of at least one social worker, should have been more closely monitored after December 20. At least the jury was entitled to draw that conclusion.

Based on the evidence at trial, a reasonable jury could have found that, after Erickson's discussion with her supervisors on December 20, WDC had "enough information to make a reasonable employer think there was some probability that [Erickson] was being sexually harassed," *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1018 (7th Cir.1996), yet took no remedial action as it was obligated to do under Title VII. *Id.; Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir. 1995).

WDC responds that the risk Spicer posed to Erickson on December 20 was not sexual—Spicer might, after all, have been contemplating killing Erickson, stealing her car keys, or simply beating her up when he was in the WCCS offices that night. But given the totality of the circumstances in this case, it was reasonable to conclude that *one* of the threats Spicer posed to Erickson during the December 20 encounter was the threat of an assault because of her sex. The fact that Spicer's presence in Erickson's workspace after hours raised the possibility of other threats, *in addition* to the threat of sexual

assault, did not relieve WDC of its obligation, under Title VII, to investigate the risk of sexual harassment to Erickson. At least, again, that was a conclusion, under the evidence, the jury was allowed to draw.

We are not saying that WDC is to be held to a strict liability standard concerning the behavior of its inmates. Judge Crabb was likewise careful to point out that her dismissal of WDC's Rule 50 motion was not based on the premise that a prison is liable whenever one of its prisoners sexually harasses an employee. If WDC had no evidence of "some probability" that sexual harassment was occurring, it would not be held liable. As Judge Crabb correctly noted, this is a close case. The totality of the circumstances in this case is crucial: if Spicer had actually been operating a vacuum near Erickson's workspace, with other workers present, at 10:30 a.m. on December 20, for example, WDC would have gotten out of this case on summary judgment. WDC is not liable for any and all actions of its inmates, but it is liable (as any other employer would be) if it fails to respond to a reasonable notice, under the circumstances, that a sexual harassment might occur.

Finally, we emphasize that WDC did not take *any* action in response to Erickson's complaint, despite Thompson's promise to Erickson that the encounter would not be repeated. *Dunn v. Washington County Hosp.*, 429 F.3d 689, 691 (7th Cir.2005) ("The genesis of inequality matters not; what *does* matter is how the employer handles the problem."). The supervisors asked no follow-up questions of Erickson or her coworkers, either at the bar or at the workplace. Nor did they question Spicer about the night of December 20 or remove him from his janitor position. And the slightest action here would have prevented a clearly preventable first-degree sexual assault. Johnson's earlier removal

of a janitor inmate makes it clear that it would have been a matter of a few minutes' time and effort to remove Spicer and eliminate the risk he posed to Erickson.

But WDC did nothing. And a reasonable jury, under the circumstances here, could find that lack of response to be unreasonable. For these reasons, the judgment of the district court is AFFIRMED.