In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-1463

ALFONSO MORALES and
DAVID KOLATSKI,

*Plaintiffs-Appellees*,

*v.*

ARTHUR JONES, MONICA RAY,
and CITY OF MILWAUKEE,

*Defendants-Appellants.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00-C-618—**David R. Herndon**, *Judge.*

———————

ARGUED JANUARY 11, 2007—DECIDED JULY 17, 2007

———————

Before BAUER, FLAUM, and ROVNER, *Circuit Judges.*

FLAUM, *Circuit Judge.* The Milwaukee Police Depart-
ment employed David Kolatski and Alfonso Morales as
police officers in its Vice Control Division ("VCD").
Kolatski and Morales were reassigned to street patrol
duties after informing an Assistant District Attorney
about allegations that Police Chief Arthur Jones and
Deputy Chief Monica Ray had harbored the Deputy
Chief's brother, who was wanted on felony warrants.
Kolatski and Morales brought suit under 42 U.S.C. § 1983,
alleging that Jones and Ray violated their First Amend-
ment rights. After a four-day trial, a jury returned a

verdict for Morales and Kolatski, awarding them compensatory and punitive damages. Jones and Ray filed a motion for judgment as a matter of law, which the district court denied. Jones and Ray appeal from that denial. For the following reasons, we reverse the district court's judgment.

## I. BACKGROUND

On March 22, 1998, Lieutenant Edward Liebrecht received a phone call from a landlord complaining that one of his tenants, Vincent Ray, was altering his property to make it suitable for selling drugs. The landlord informed Liebrecht that he knew Vincent Ray was Deputy Chief Ray's brother because of his rental application. Liebrecht spoke about the complaint with Chief Jones, who told Liebrecht to investigate the matter immediately. Liebrecht subsequently notified Deputy Chief Ray of the call. She confirmed that Vincent Ray was her brother and that he was a heroin addict. She also told Liebrecht that her brother might be wanted on warrants.

Liebrecht assigned the case to Morales and Detective Joseph Link. Morales ran a warrants check on Vincent Ray and discovered that he was wanted on two felony warrants. Link and Morales then met with Vincent Ray's landlord who showed them the altered property and informed them that he had asked Ray to vacate the premises. After speaking with Ray's landlord, the officers drove to each of the addresses Ray provided in his rental application in an attempt to locate him or his car.

Liebrecht's shift ended at 3 p.m. that day, and Lieutenant James Shepard relieved him. Before the end of his shift, Liebrecht called Chief Jones to update him on the investigation. At 4 p.m. the landlord informed Morales and Link that Vincent Ray had called him. The landlord

also told the officers that he had set up a meeting with Ray to return his security deposit at 5 p.m. the following day, March 23. The landlord also provided the detectives with the phone number from which Ray called. The detectives planned on arresting Ray at this meeting.

Shepard instructed Link to write a report detailing the investigation. Link included the landlord's allegations, his and Morales' efforts to locate Ray, the names, addresses, and phone numbers from Ray's rental application, Ray's outstanding warrants, and the detectives' plans to arrest him on March 23 at 5 p.m.

On March 23, 1998, Link and Morales attempted to arrest Ray at the scheduled meeting with his landlord, but Ray did not show up. Ray set up two more meetings to get his security deposit, and both times the detectives informed Shepard that they planned to arrest him. However, Ray failed to appear at those meetings as well.

On April 6, 1998, the landlord called Morales and told him that Ray was working on his car around the 3000 block of West Burleigh Street. Morales informed Link, but Link was executing a search warrant in another investigation. Morales decided not to inform Shepard about the tip because the three previous meetings had fallen through. Instead, he asked Kolatski to help him arrest Ray. Morales and Kolatski arrested Ray on two felony warrants. The detectives found a knife, marijuana, and three rocks of cocaine in Ray's car. The detectives took him to the police administration building and then made arrangements to meet Link.

Morales and Kolatski met Link at Gold Rush Chicken to pick up dinner. After ordering dinner at the counter, Morales went to the restroom. Kolatski and Link stayed at the counter discussing the details of Ray's arrest, although they did not use his name. Kolatski told Link that "he had a bad feeling about the situation." Gold Rush

Chicken's owner, John Mullarkey, who was a friend of Deputy Chief Ray, overheard the conversation and asked Kolatski, "what did you do, throw the Chief in jail?" Kolatski said no. Mullarkey then asked whether they had thrown Deputy Chief Ray in jail. Kolatski again said no and explained that they had arrested the relative of a higher ranking department member. Mullarkey told the detectives that two weeks earlier he delivered food to Deputy Chief Ray's house and that Chief Jones was there when a man came out of a back room. Mullarkey explained that had he not been in the presence of two police officers, he would have been worried that the man might rob him. Link and Kolatski asked Mullarkey to describe the individual. Mullarkey identified him as a black man with a dark complexion and a tattoo on his upper body. Mullarkey also said that Deputy Chief Ray introduced him as her brother.

Morales returned from the restroom. After leaving the restaurant, Kolatski told Morales about Mullarkey's story. The three detectives agreed that the allegations were serious because, if true, the Chief and Deputy Chief had harbored a felon.

After returning to the police administration building, Link told Lieutenant Habeck, the on-duty supervisor, that Vincent Ray had been arrested. Habeck informed Deputy Chief Ray that her brother was in custody. Link, Kolatski, and Morales listened to a phone call between Habeck and Deputy Chief Ray, in which the Deputy Chief asked what address Vincent Ray gave the officers when they arrested him. When Habeck said that Ray had provided Deputy Chief Ray's address, she instructed Habeck not to include that address on the arrest report. Habeck relayed the instruction not to list Deputy Chief Ray's name or

address on Vincent's arrest or pedigree reports to Link.[1] Link refused to falsify the reports and included Deputy Chief Ray's name but simply listed her address as "County of Milwaukee."

On the evening of April 6, 1998, Morales reviewed Vincent Ray's arrest reports, made copies of them, and filed them with his supervisor, leaving the reports on his desk for the evening. The next morning, Morales returned to take the reports to the District Attorney's ("D.A.") office, and discovered that the first page of the pedigree report, listing Deputy Chief Ray's name, was missing. Morales searched for the missing report, did not locate it, and decided to proceed to the D.A.'s office anyway.

Morales met with Assistant D.A. John Chisholm and provided him with a synopsis of Ray's arrest and the possible charges. Chisholm asked Morales why the first page of the pedigree report was missing. Morales said that to the best of his knowledge the page had been ordered not to include any information related to Deputy Chief Ray and that he had pages two and three of the report, but did not know where page one was located.

Chisholm inquired further, and Morales told him about the investigation and Ray's arrest. Morales also told Chisholm that he and Link had notified Shepard on three separate occasions of arranged meetings to arrest Vincent Ray, but that all three meetings fell through. Morales then recounted Mullarkey's conversation with Kolatski and Link, as well as Deputy Chief Ray's instructions to leave her information out of the arrest reports. Morales told Chisholm that he believed that prior to Ray's arrest, someone had known Vincent Ray's location and informed

---

[1] A pedigree report is a report that lists an arrestee's name, age, gender, physical description, race, family members, home address and phone number, among other information.

Ray to avoid meeting with the landlord to receive his security deposit.

Chisholm met with Deputy District Attorney Jon Reddin and relayed Morales' information. Reddin instructed Chisholm to interview Mullarkey. Chisholm and another investigator spoke with Mullarkey who confirmed that he told Kolatski and Link about his delivery to Deputy Chief Ray, but was now certain that the delivery occurred in January 1998. Mullarkey stated that one of his employees made a delivery to Deputy Chief Ray's home within the past two weeks and provided the employee's name.

On April 8, 1998, Link and Morales met with Chisholm and Reddin. Chisholm and Reddin spoke to Link who confirmed that Habeck instructed him to omit Deputy Chief Ray's name and address from the pedigree report, but that he refused to do so. Link verified his discussion with Mullarkey as well.

Link and Morales reported the D.A.'s investigation to Liebrecht. Liebrecht informed a superior who met with Chief Jones, Deputy Chief Ray, and Link. Deputy Chief Ray then met with Morales to discuss the D.A.'s investigation.

During the same day, Chisholm went back to Mullarkey's restaurant and discovered that Mullarkey had made food deliveries on March 19 and 23, 1998, though he had previously denied making any food deliveries since January 1998. In addition, another investigator interviewed the driver who delivered food to Deputy Chief Ray's home on March 28th. The driver denied seeing a male at Deputy Chief Ray's residence. Additionally, Chisholm discovered that there were no food deliveries on March 29, and all of the April food delivery receipts were off premises at Mullarkey's home. As a result, the D.A.'s office concluded that Mullarkey's allegations against Chief Jones and Deputy Chief Ray were false.

On April 17, 1998, Chief Jones transferred Kolatski from VCD to District No. 1 night-shift patrol duty. No one in the police department explained why Kolatski was transferred, and he was performing well at the time. On December 8, Link and Morales gave depositions in *Kuchenreuther v. Jones*, a case in which Chief Jones was accused of transferring a police officer in violation of the officer's First Amendment rights. During Morales' deposition, he testified about the Mullarkey information and opined that Kolatski was transferred as a result of events connected with Vincent Ray's arrest. Within days of the December 8 depositions, Chief Jones reassigned Link to the VCD's prostitution section. Nearly two months later, on January 22, 1999, Chief Jones transferred Morales to District No. 6 night-shift patrol duty.

On May 20, 2000, Morales and Kolatski filed a complaint in the Eastern District of Wisconsin under 42 U.S.C. § 1983, alleging that Chief Jones and Deputy Chief Ray violated their First Amendment rights by transferring them to patrol duties. The defendants filed a motion for judgment on the pleadings, which the district court denied. After the close of discovery, the defendants filed a motion for summary judgment. The district court also denied that motion. On November 19, 2005, after a four-day trial, the jury returned a special verdict in the plaintiffs' favor. The jury awarded both plaintiffs $20,000 in compensatory damages and $65,000 in punitive damages, finding that the defendants' actions were wilful, wanton and malicious. On December 6, 2005, the defendants filed motions for judgment as a matter of law. On February 1, 2006, the district court denied those motions and granted the plaintiffs' motions for attorneys' fees and costs. The defendants now appeal.

## II. DISCUSSION

The defendants argue that the district court erred by not granting them judgment as a matter of law because Kolatski's and Morales' speech was not protected by the First Amendment. This Court reviews de novo the district court's denial of a motion for judgment as a matter of law. *LaFollette v. Savage*, 63 F.3d 540, 543-44 (7th Cir. 1995).

The defendants argue that their actions did not violate the plaintiffs' First Amendment rights because the plaintiffs' speech was made pursuant to their official duties. The Supreme Court has made clear that public employees do not surrender all of their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. *See, e.g.*, *Rankin v. McPherson*, 483 U.S. 378 (1987); *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will County, Ill.*, 391 U.S. 563 (1968). The Supreme Court recently clarified, however, that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, __ U.S. __, 126 S.Ct. 1951, 1960 (2006).[2]

In *Garcetti,* the Court evaluated the First Amendment claims of a deputy district attorney (Ceballos). Believing that a search warrant affidavit contained misrepresentations, Ceballos wrote two memoranda recommending the dismissal of pending charges. *Id.* at 1955-56. He was

---

[2] The district court ruled in this case on February 1, 2006. The Supreme Court decided *Garcetti* on May 30, 2006. As a result, the district court did not have the opportunity to consider *Garcetti* in its analysis.

later transferred from his calendar deputy position to a trial deputy position and assigned to work at another location. *Id.* at 1956. He sued under § 1983, alleging retaliation for his speech. Focusing on the "citizen" prong of the First Amendment analysis, the Court determined that Ceballos "wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do." *Id.* at 1960. Because his expression was "pursuant to" his official duties, he was not speaking as a citizen for First Amendment purposes. *Id.* The Court stated, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.*

In light of *Garcetti,* the crux of our inquiry is whether Morales' and Kolatski's speech was made pursuant to their official duties. Because both parties in *Garcetti* agreed that Ceballos' speech was made pursuant to his official duties, the Court "had no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." 126 S.Ct. at 1961. Lower courts, including this one, have applied *Garcetti* in an attempt to define the scope of an employee's duties. *See Haynes v. City of Circleville, Ohio*, 474 F.3d 357 (6th Cir. 2007); *Mayer v. Monroe County Cmty. Sch. Corp.,* 474 F.3d 477 (7th Cir. 2007); *Green v. Bd. of County Comm'rs*, 05-6297, 2007 WL 4210 (10th Cir. Jan. 2, 2007); *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006); *Battle v. Bd. of Regents for the State of Ga*, 468 F.3d 755 (11th Cir. 2006); *Mills v. City of Evansville*, 452 F.3d 646 (7th Cir. 2006).

Those courts have followed the Supreme Court's general guidance that "the inquiry is a practical one" and

should focus on "the duties an employee actually is expected to perform." *Id.* at 1962. For example, in *Battle*, the plaintiff was the financial aid counselor at Fort Valley State University. Her job required her to verify the completion and accuracy of student files as well as report any perceived fraudulent activity. 468 F.3d at 758. The plaintiff reviewed several student files, discovering that her supervisor had been falsifying information and awarding financial aid to ineligible recipients. The plaintiff spoke to the supervisor, the University president, and finally to the University's Vice-President of Student Affairs. Shortly after her final meeting, the University decided not to renew the plaintiff's contract. The Eleventh Circuit held that because the plaintiff's specific job responsibilities included ensuring the accuracy and completeness of student files and reporting any mismanagement or fraud, her speech was made pursuant to her official employment responsibilities. The court also noted that Department of Education Guidelines require all financial aid workers to report suspected fraud. *Id.* at 761.

Lower courts have also been careful to recognize that, under *Garcetti*, "public employees retain the prospect of constitutional protection for their contributions to the civic discourse." 126 S.Ct. at 1960. In *Freitag*, the plaintiff, a corrections officer, was sexually harassed by several inmates at the Pelican Bay State Prison. She complained to her supervisors that her documentation of the incidents was denied or thrown away. After she complained to her state senator and the State Office of the Inspector General, the prison warden terminated her. The Ninth Circuit held that the plaintiff's "right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee." 468 F.3d at 545. The court stated that "it was certainly not part of her official tasks to complain to the [s]enator or the IG about

the state's failure to perform its duties properly . . . . Rather, it was [the plaintiff's] responsibility as a citizen to expose such official malfeasance to broader scrutiny." *Id.*

The plaintiffs first contend that their statements were not a part of their official duties because they learned of Mullarkey's unfounded allegations after they arrested Ray. Yet the plaintiffs admit that their duties included "processing arrests through [the] District Attorney's office, requesting [the] [D]istrict [A]ttorney's office for advice on certain methods to utilize on investigations, and completing it through the court system, whether it be a trial or through guilty pleas." Therefore, by their own admission, the plaintiffs' official duties did not end when they arrested Ray.

Second, the plaintiffs maintain that their speech was not made pursuant to their official duties because Chief Jones ended his own internal investigation into whether Kolatski disclosed confidential information to Mullarkey. Chief Jones reasoned that because the arrest had already taken place, the detectives' discussion with Mullarkey did not pose a threat to the investigation. The plaintiffs argue that this demonstrates that their official duties concluded as soon as they arrested Vincent Ray. As explained above, however, the plaintiffs concede that their duties continue after a suspect's arrest. Moreover, Chief Jones' investigation does not bear on whether the plaintiffs' speech was made pursuant to their official duties.

Finally, Kolatski and Morales argue that their speech was not made pursuant to their official duties because they were unsure about how to handle Mullarkey's allegations. However, the plaintiffs' confusion about which course of conduct to take in dealing with Mullarkey's allegations does not indicate that they were not acting pursuant to their official duties as police officers.

After reviewing the record, we conclude that Kolatski's speech was not protected under the First Amendment because it was made pursuant to his official duties. Kolatski told Morales about Mullarkey's allegations because Morales recruited Kolatski to assist him in arresting Ray. As a result, Kolatski had a duty to apprise Morales of any information pertinent to the investigation. Consequently, the judgment in favor of Kolatski must be reversed.

As for Morales, his conversation with A.D.A. Chisholm was made pursuant to his official duties because he met with Chisholm in his capacity as a VCD officer. They met to discuss Vincent Ray's arrest and review the arrest report. It was Morales' duty to assist Chisholm in the proper presentation of charges by providing him with the arrest reports and details of his investigation. Morales informed Chisholm of Mullarkey's allegations against Chief Jones and Deputy Chief Ray in response to Chisholm's inquiry into the pedigree report's missing page. Morales did not meet with Chisholm on his own time to report information that was unconnected to anything he was working on. Indeed, Morales's speech concerned a case that he was assigned to investigate. Furthermore, the Milwaukee Police Department requires officers to report all potential crimes.[3] By informing A.D.A. Chisholm of the allegations against Chief Jones and Deputy Chief Ray, Morales was performing that duty as well. Accordingly, his conversation with A.D.A. Chisholm is not protected under the First Amendment after *Garcetti*.

Morales' December 8 deposition testimony is a different story. In his deposition, Morales testified about

---

[3] The dissent emphasizes the fact that Morales testified that he had the discretion whether or not to investigate Mullarkey's allegations. However, when Morales chose to exercise that discretion he did so pursuant to his job duties.

Mullarkey's allegations, his conversation with A.D.A. Chisholm, and his opinion that Kolatski was transferred because they had reported the allegations against the Chief and Deputy Chief. Being deposed in a civil suit pursuant to a subpoena was unquestionably not one of Morales' job duties because it was not part of what he was employed to do. Nonetheless, Morales testified about speech he made pursuant to his official duties and we must determine whether that fact renders his deposition unprotected. We hold that it does not.

The purpose of *Garcetti* was to allow government employers greater influence over speech that owes it existence to a public employee's professional responsibilities and that is damaging to the government's capacity to conduct public business. 126 S.Ct. at 1958 ("Government employers . . . need a significant degree of control over their employees' words and actions . . . ."). Here, because the substance of Morales' speech is the same, it poses the same threat to the MPD regardless of whether it is said to A.D.A. Chisholm or in a deposition. We recognize the oddity of a constitutional ruling in which speech said to one individual may be protected under the First Amendment, while precisely the same speech said to another individual is not protected. Indeed, this is exactly the concern that Justice Stevens voiced in his dissent in *Garcetti*: "[I]t is senseless to let constitutional protection for exactly the same words hinge on whether they fall within a job description." 126 S.Ct. at 1963. Despite Justice Stevens' admonishment, *Garcetti* established just such a framework, and we are obliged to apply it. As a result, although we hold that Morales' conversation with Chisholm was unprotected speech, his deposition testimony was protected.

Thus, we are faced with a difficult situation because Morales presented the jury with evidence of both his protected and unprotected speech. We do not know

whether the jury found that Chief Jones and Deputy
Chief Ray retaliated against Morales solely on the basis
of protected speech, unprotected speech, or a combination
of both.[4] Because of our uncertainty, we remand to the
district court for a new trial on Morales' claims.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district
court's ruling denying the defendants' motion for judg-
ment as a matter of law with regard to Kolatski, and we
REMAND for a new trial on Morales' claims.

ROVNER, *Circuit Judge*, concurring in part and dissent-
ing in part. A jury found that these officers were reas-
signed to undesirable posts in retaliation for their
speech. After *Garcetti*, the first question we must answer

---

[4] The dissent contends that "it is highly unlikely that the jury
relied" on Morales' conversation with A.D.A. Chisholm as the
cause of Morales' demotion. The dissent relies solely on timing,
stating that Morales was transferred "shortly" after his Decem-
ber 8 deposition testimony. In fact, Morales was transferred
almost two months after he gave his deposition testimony.
Moreover, the trial transcript reveals that the focus of Kolatski's
and Morales' testimony dealt with the Ray investigation and
Morales' conversation with A.D.A. Chisholm, not Morales'
deposition testimony. In short, we cannot determine which
speech the jury relied upon to find that the defendants re-
taliated against Morales.

is whether the speech at issue was "made pursuant to the employee's official duties." *Garcetti*, 126 S. Ct. at 1955. But before we answer that question, we must discern exactly what speech is at issue. *Green v. Board of County Comm's*, 472 F.3d 794, 799 (10th Cir. 2007) (as a starting point in a *Garcetti* analysis, the court must determine what speech and conduct are at issue). As the majority notes, the speech at issue for Detective Kolatski was his conversation with Officer Link and Mr. Mullarkey in the Gold Rush restaurant, and his subsequent conversation with Lieutenant Morales on the way back to the police station after picking up dinner.[1] These discussions both occurred on a single day in April 1998. In each instance of speech, Detective Kolatski was either investigating a possible crime or conveying information about a possible crime to other officers who were more intimately involved in the investigation and arrest of Vincent Ray. The defendants demoted Detective Kolatski only a few days later and a jury found that the demotion was retaliation for his speech. Because I agree that Detective Kolatski's speech was made pursuant to his official duties, I concur in the majority's holding that his speech was not protected by the First Amendment. The Supreme Court remarked that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance." *Garcetti*, 126 S. Ct. at 1962. Detective Kolatski was performing his job admirably at the time of these events, and although his demotion for truthfully reporting allegations of misconduct may be morally repugnant, after *Garcetti* it does not offend the First Amendment. In *Garcetti*, after all, the Court wished to avoid a rule that would mandate "judicial

---

[1] At the time of the events at issue here, Detective Kolatski and Lieutenant Morales both held the rank of police officer. They received their respective promotions prior to the time of trial and I will use their more current designations here.

oversight of communications between and among government employees and their superiors in the course of official business." 126 S. Ct. at 1961.

The case of Lt. Morales is another story. The speech at issue for Lt. Morales consisted primarily of his discussions with the district attorney's office and the deposition he gave many months later in an unrelated civil case. We review *de novo* the district court's denial of the defendants' motion for judgment as a matter of law. *Erickson v. Wisconsin Dept. of Corr.*, 469 F.3d 600, 601 (7th Cir. 2006); *Davis v. Wisconsin Dept. of Corr.* 445 F.3d 971, 975 (7th Cir. 2006); *Byrd v. Illinois Dept. of Pub. Health*, 423 F.3d 696, 712 (7th Cir. 2005). In conducting that review, we must view the facts in the light most favorable to Lt. Morales, the party opposing the motion, and we must disregard all evidence favorable to the moving parties that the jury was not required to believe. *Erickson*, 469 F.3d at 601; *Davis*, 445 F.3d at 975. We may overturn a jury verdict in favor of Lt. Morales only if no reasonable jury could have found for him. *Erickson*, 469 F.3d at 601; *Davis*, 445 F.3d at 975. *See also Byrd*, 423 F.3d at 712 (in reviewing a district court's decision to deny a Rule 50 motion, we must review all of the evidence in the record, drawing all reasonable inferences in favor of the non-moving party, and assure that the jury was presented with a legally sufficient basis to support the verdict).

Recall that Lt. Morales's discussions with the district attorney's office arose when he attempted to deliver Vincent Ray's incomplete arrest report to that office. The arrest report was missing the first page of the so-called "pedigree report" that identified the Deputy Chief of Police, Monica Ray, as Vincent Ray's sister and listed her address as Milwaukee County. The evidence at trial demonstrated that this rather vague address was due to Monica Ray's directive not to list her name or address on the report and to change Ray's address to that of "a fucking light pole" if

necessary. R. 145, at 723. The officers who were attempting to comply with the directive of the Deputy Chief while simultaneously trying to avoid filing a false report decided that "Milwaukee County" was a specific enough address for both Ray and the light pole. R. 145, at 727. All of Lt. Morales's comments about the Chief and Deputy Chief to the district attorney came in response to questions about the missing page of the pedigree report. At the time, Lt. Morales was on duty, delivering a report he was obliged to deliver, and assisting the district attorney in Vincent Ray's prosecution. However, as Lt. Morales testified, although he was obliged to deliver the report and assist in Ray's prosecution, he was not obliged to report his suspicions about why the report page was missing. R. 144, at 628, 641, 646. In disclosing his suspicions, he went beyond his work duties.

The majority relies in large part on an assumption that Lt. Morales was obliged under department policy to report all potential crimes and thus was speaking pursuant to his job duties when he reported possible misconduct by the Chief and Deputy Chief to the district attorney. But Lt. Morales testified that, although that was the department rule, in practice, he had considerable discretion in determining whether to report or pursue investigation of a potential crime. *See* R. 143, at 500-03. At trial, Lt. Morales was asked, "In the course of conducting an investigation, what kind of discretion do you as a police officer have to do the investigation? In other words, if you come upon information, what discretion do you have to even investigate?" He answered, "I have discretion not to investigate it." R. 143, at 501-02. Lt. Morales also testified that he is "not duty bound" to investigate when he receives information about potential wrongdoing. R. 143, at 502. Rather, he has the discretion to weigh the facts at hand, and in light of other investigations he is conducting, may elect not to pursue the infor-

mation further. R. 143, at 502-03. Thus, when he saw that Vincent Ray failed to show up for three scheduled meetings that had been reported to commanding officers, when he learned about Mr. Mullarkey's allegations that the Chief and Deputy Chief had been present with Vincent Ray at a time they both knew he was wanted on warrants, and when he heard the Deputy Chief's directive to keep her name and address off the pedigree report, he was not obliged to report his suspicion that the missing report page was related to these events. In short, he had the "option to ignore it." R. 144, at 549. *See also* R. 144, at 551 ("Again, I had the discretion. I could have ignored all of this."). In fact, he testified that, *as a police officer*, he could not do anything with this information or his suspicions:

> I couldn't do anything with it. I'm a police officer at that time. The allegations are against the third person in command and the Chief of Police. I had to give it to someone outside of the police department.

R. 144, at 547. The Chief himself testified that he was unsure what he would have done if he had been in Lt. Morales's position, where someone had told him the Chief of Police had possibly been involved in criminal activity:

> [W]hat would I do? I don't know. I ask myself that. Would I go back and tell somebody within the police department? No.

> I think if the officer felt that that was the place that he needed to reveal any information he had, the District Attorney's Office was an appropriate place for it to happen. The District Attorney has investigators that have arrest powers that they could send out to investigate. Obviously, the District Attorney, the Deputies, can do some investigation themselves or inquiries themselves.

R. 143, at 365.

The *Garcetti* majority was not faced with the situation

we have here and admittedly gave us no "comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Garcetti*, 126 S. Ct. at 1961. The Court did offer some hints on how this analysis should be performed. The Court instructed that "[t]he proper inquiry is a practical one." *Garcetti,* 126 S. Ct. at 1961. The Court rejected the notion that we were limited to job descriptions in determining the nature of official duties because "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 126 S. Ct. at 1962. Such appears to be the case here where the departmental rule differed from the manner in which the officers actually performed their duties. Because the evidence that the jury was entitled to believe on this point contradicts the majority's assumption, I would not rely on Lt. Morales's supposed duty to report all potential wrongdoing in determining whether this speech was protected by the First Amendment.

There are other hints in *Garcetti* that help dictate the analysis here. The Court was concerned, for example, that "[o]fficial communications have official consequences," and that "[s]upervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Garcetti*, 126 S. Ct. at 1960. The Court opined that employees may receive protection for expressions made at work rather than publicly, and that it also is not dispositive that the speech concerns the subject matter of the plaintiff's job. 126 S. Ct. at 1959. In *Garcetti*, the Court found that the significant factor was that Cebellos' memo

was written pursuant to his official duties:

> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Garcetti*, 126 S. Ct. at 1960. The Court noted that Cebellos did not act as a citizen when he conducted his daily professional activities; rather when "he went to work and performed the tasks he was paid to perform, Cebellos acted as a government employee." 126 S. Ct. at 1960. The Court also characterized Cebellos's memo as the "work product" of a government employee. The Court commented that government employees who make public statements outside the course of performing their duties retain First Amendment protection because that is the kind of activity engaged in by persons who do not work for the government. Thus, a letter to a local newspaper is protected as is a discussion of politics with a co-worker. *Garcetti*, 126 S. Ct. at 1961.

We must consider, then, whether Lt. Morales's comments to the district attorney constitute "work product," whether his words owed their existence to his professional responsibilities, whether it is speech that his employer commissioned or created, or whether it is the kind of activity engaged in by persons who do not work for the government. Lt. Morales certainly became aware of the facts that he reported and formed the opinions that he expressed because of his work in investigating and arresting Vincent Ray. But for his job duties, Lt. Morales would not have known that Vincent Ray failed to show up for three meetings that had been reported up the chain of command; he would not have been aware of Mr. Mullarkey's allegations; he would not have been privy to Monica Ray's

directive to keep her name and address off the pedigree report. The fact that his speech concerned the subject matter of his employment is not dispositive, though, because in *Garcetti*, the Court reaffirmed the principle that the First Amendment protects some speech related to the speaker's job, at least in part because front line workers like teachers (as was the case in *Pickering*) or police officers (as we have here) are, as a class, most likely to have informed and definite opinions about matters of public concern related to their jobs. *Garcetti*, 126 S. Ct. at 1959 (citing *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410 (1979), and *Pickering v. Board of Educ. of Twp. High Sch. Dist. 205, Will County, Ill.*, 391 U.S. 563 (1968)). When he spoke to the district attorney, Lt. Morales was on duty and responding to questions about papers he was obliged to present to the state's attorney as part of his official job duties. However, because Lt. Morales was not required, as a practical matter, to report these allegations, this is a close case under *Garcetti*. The information that Lt. Morales conveyed was work product only in the sense that he learned the information while at work. But the work he was paid to perform that day, to paraphrase *Garcetti*, was the prosecution of Vincent Ray. Both government employees and persons who do not work for the government may report possible wrongdoing or crimes by government officials. In this case, reporting possible wrongdoing was beyond the scope of Lt. Morales's required job duties.

Construing the facts in favor of Lt. Morales, he may have begun his conversation with the district attorney as a police officer, but when he went beyond his obligations as a police officer and decided to disclose his suspicions about the Chief and Deputy Chief, he was speaking to the district attorney as a witness to public corruption, in the same fashion any citizen who witnessed suspicious conduct by a government official might speak. *See Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006), *cert. denied*, 127

S. Ct. 1918 (2007) (where it was not part of jail guard's official tasks to complain to a senator or inspector general about the failure of jail officials to respond to charges of sexual harassment at the jail, the guard was speaking as a citizen when she exposed official malfeasance to broader scrutiny and thus her speech was protected by the First Amendment). In *Garcetti*, the Supreme Court noted that "when a public employee speaks pursuant to employment responsibilities . . . there is no relevant analogue to speech by citizens who are not government employees." 126 S. Ct. at 1961. In this case, unlike *Garcetti*, there is a relevant analogue to speech by citizens who are not public employees. Any citizen may report suspicions of public corruption to the district attorney's office, which, as I noted above, had the ability and the authority to investigate allegations of wrongdoing at the highest levels of the police department. A reasonable jury could find, and I would find, on balance, that Lt. Morales spoke as a private citizen when he conveyed his suspicions to the district attorney and his speech was therefore protected by the First Amendment.

But even if the discussions with the district attorney were unprotected, I am not convinced that the jury found those discussions to be the sole, or even the primary, motivating factor in the defendants' retaliation. In fact, it is highly unlikely that the jury relied on those stale conversations as the cause of Lt. Morales's demotion. The discussions with the district attorney occurred in April 1998 and no action was taken against Lt. Morales until approximately nine months later, shortly after he gave a deposition in an unrelated civil case. Approximately seven months after Lt. Morales met with the district attorney, in December 1998, he and Officer Link gave depositions in the case of *Kuchenreuther v. Jones*. In *Kuchenreuther*, another officer sued Chief Jones for retaliating against her for exercising her First Amend-

ment rights. At his deposition, Lt. Morales testified about the Mullarkey incident and stated that he believed Detective Kolatski was transferred as a result of events connected with the arrest of Vincent Ray and the aftermath of the Mullarkey allegations. Lt. Morales was transferred approximately six weeks after that deposition. Officer Link, who was not a plaintiff here, also was transferred (albeit temporarily) to a considerably less desirable position shortly after the depositions.

The key question, then, is whether that deposition testimony was given pursuant to Lt. Morales's official duties. The district court found that Lt. Morales's deposition could not be tied to any of his required duties as a police officer. The majority does not address that finding by the district court and thus does not address whether and to what extent we should defer to the district court's fact-finding. Even assuming that we need not defer to the district court at all, though, I would find, as the majority has found, that Lt. Morales's deposition was given as a citizen and not pursuant to official duties.

The defendants make no attempt to demonstrate that testifying at a civil deposition for a co-worker's lawsuit was part of Lt. Morales's job duties. Nor could they. There is nothing in the record below to suggest that the deposition testimony was work that Lt. Morales was expected to perform as part of his formal or informal job duties, that it was conducted pursuant to his job duties or at his employer's behest, that it was work product of the police department, that it was official speech, or that it was one of the tasks he was paid to perform. Although the subject matter of the deposition related to information Lt. Morales learned on his job, his testimony owed its existence not to his job but rather to a subpoena in a lawsuit. *See Fairley v. Fermaint*, 482 F.3d 897, 902 (7th Cir. 2007). In *Fairley*, county jail guards brought § 1983 claims against the county sheriff and other guard personnel,

claiming they were harassed for exercising their First Amendment right to speak out against abuse of prison inmates. 482 F.3d at 899. The defendants sought to invoke *Garcetti* for the proposition that the plaintiffs' speech in the workplace is not protected by the First Amendment. We noted that, under the plaintiffs' theory, the "defendants reacted adversely to two kinds of speech: not only statements made as part of their duties at work (the kind of speech to which *Garcetti* applies) but also to testimony that plaintiffs gave in inmates' suits." *Fairley*, 482 F.3d at 902. Because "[a]ssistance to prisoners and their lawyers in litigation is not part of a guard's official duties," we needed to determine what part of the defendants' retaliation could be traced to the plaintiffs' litigation activity as opposed to events at work. 482 F.3d at 902. *Fairley* applies directly to the circumstances we have here, where it was not part of Lt. Morales's job duties to assist his fellow officer in her suit against the Chief.

Because they cannot demonstrate that the deposition was given pursuant to Lt. Morales's job duties, the defendants rely entirely on an argument that deposition testimony about unprotected speech does not constitute protected speech. Unlike the majority, I would find that the underlying speech was protected but I will assume for the sake of argument that it was not. The defendants rely on *Morris v. Crow*, 142 F.3d 1379 (11th Cir. 1998), and *Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440 (4th Cir. 2004), for the proposition that Lt. Morales's deposition testimony was unprotected speech. Neither of these cases supports the defendants' position. Morris was an employee of the sheriff's department who was called upon to investigate an accident in which an unmarked sheriff's car, en route to an emergency call, collided with a citizen's vehicle, killing the citizen. Morris investigated the accident and wrote an official report where he concluded that the officer driving the unmarked squad car was traveling more

than 130 mph in a 50 mph zone without using his blue warning lights, in contravention of department policy. After Morris filed that report, the citizen's personal representative brought a wrongful death suit against the sheriff's department and Morris was deposed in connection with that suit. At the deposition, he reiterated the allegations of his report and opined that if the officer had been traveling the posted speed limit, there was a great possibility the accident would not have occurred. *Morris*, 142 F.3d at 1381.

The appeals court found that the accident report was generated pursuant to Morris's official and customary duties. In that respect, the court appeared to have anticipated *Garcetti*. But the court then distinguished Morris's case from two others that closely resemble the facts we have here in Lt. Morales's case. *See Morris*, 142 F.3d at 1382, citing *Fikes v. City of Daphne, Tex.*, 79 F.3d 1079 (11th Cir. 1996), and *Warnock v. Pecos County*, 116 F.3d 776 (5th Cir. 1997). In *Fikes*, an officer who had no obligation to do so reported two instances of misconduct by fellow officers. In that case, the *Morris* court found, the plaintiff was not speaking pursuant to work duties but was trying to bring to light actual or potential wrongdoing on the part of government officials. In *Warnock*, a county auditor reported a number of violations of law or fiscal improprieties committed by county officials to her superiors and to appropriate law enforcement officers. Although Warnock generated her report in the normal course of her duties as an auditor, the *Morris* court distinguished her case because the plaintiff's purpose was to raise issues of public concern. Morris, on the other hand, wrote his report not to bring to light any wrongdoing but rather to accurately report an accident in the course of his employment. The court found that Morris's deposition could not "be characterized as an attempt to make public comment on sheriff's office policies and procedures, the internal

workings of the department, the quality of its employees or upon any issue at all." *Morris*, 142 F.3d at 1382. The *Morris* court thus concluded that the "mere fact that Morris's statements were made in the context of a civil deposition cannot transform them into constitutionally protected speech." 142 F.3d at 1383. Like Fikes, Lt. Morales was not obliged to report possible wrongdoing by the Chief and Deputy Chief. And like both Fikes and Warnock, Lt. Morales was attempting to bring to light issues of public concern. When read in whole, the *Morris* court found that Morris's accident report was unprotected because it was an official report made in the normal course of his duties, and his deposition was unprotected because he was not attempting to bring to light matters of public concern. It is thus difficult to see how *Morris* helps the cause of the defendants in the instant case where Lt. Morales was not obliged to report the wrongdoing and was in fact trying to bring to light a matter of grave public concern. Under *Morris*, a pre-*Garcetti* case, Lt. Morales's speech would be protected because he had no work-related duty to speak and he was motivated by a desire to bring to light possible government corruption. I note, however, that the *Morris* court's use of the speaker's motive as a factor that overrides the citizen/employee distinction cannot survive *Garcetti*. In sum, *Morris* does not aid the defendants' cause, and I also believe that *Morris*, at least in part, is no longer good law.

As for *Kirby*, another pre-*Garcetti* case on which the defendants rely, the issue was not whether the plaintiff police officer was speaking as a citizen but rather whether his speech addressed a matter of public concern. *Kirby*, 388 F.3d at 446-47. Kirby testified at a hearing before a City Personnel Appeals Committee regarding a grievance filed by a fellow officer. That officer had been disciplined for damaging his police car by failing to properly maintain it. Kirby testified about the maintenance history of the fellow

officer's car and provided an opinion about the maintenance and driving habits of that officer. 388 F.3d at 443. The court found that Kirby's speech did not involve a matter of public concern but rather related only to the interests of the officers involved. Moreover, the court found, the fact that Kirby's testimony was given in a public hearing did not transform it into a matter of public concern. No one could argue in the instant case that allegations of wrongdoing against the two highest ranking members of the Milwaukee Police Department did not touch on a matter of public concern. *Kirby* is irrelevant to the issue before this court. *See also Green v. Barrett*, 2007 WL 754634 (11th Cir. Mar. 14, 2007).[2]

Because I would find that Lt. Morales's speech was protected in its entirety by the First Amendment, I will briefly address the question of qualified immunity. I say briefly because it should be obvious to anyone and certainly to the Chief and Deputy Chief of Police that it is illegal to retaliate against a person for reporting a possible crime or for testifying under oath in a deposition as part of a judicial proceeding. In the federal system, we call such retaliation "witness tampering" or "obstruction of justice," and these principles were established long before the

---

[2] In that case, a jailer was called to testify pursuant to her official duties, at the behest of her employer, in the normal course of work. The court found that the jailer's testimony was therefore not protected by the First Amendment. Her testimony *was* her work that day. Lt. Morales was not called to testify pursuant to his official duties. He had no work-related obligation to testify. There is no evidence in the record indicating that Lt. Morales testified at that deposition at the behest of the Chief or Deputy Chief. And, finally, there is no evidence that the deposition was given in the normal course of Lt. Morales's work. On the contrary, he was essentially testifying as a witness in a civil lawsuit unrelated to his duties as a police officer.

events in this case. *See Fairley*, 482 F.3d at 902. As we noted in *Fairley*, "no public official could think the conduct proper." *Id.* I would therefore find that the defendants were not entitled to qualified immunity. For the same reason, I would not disturb the award of punitive damages.

If, as the majority finds, Lt. Morales's discussion with the district attorney was not protected, I would still affirm the judgment rather than grant a new trial. First, given that the demotions of both Lt. Morales and Officer Link came hot on the heels of their depositions, it is reasonable to assume that the jury found that the defendants demoted Lt. Morales because of his recent deposition and not because of a conversation he had with the district attorney some nine months earlier. As I noted above, we may overturn a jury verdict in favor of Lt. Morales only if no reasonable jury could have found for him. *Erickson*, 469 F.3d at 601; *Davis*, 445 F.3d at 975. A reasonable jury could and did find in favor of Lt. Morales and I would affirm that judgment.

Second, the majority's decision to remand Lt. Morales's case for a new trial gives the defendants a gift for which they did not ask. In their request for relief on appeal, the defendants asked that we reverse the decision of the trial court and hold as a matter of law that all of the relevant speech is not protected by the First Amendment. In the alternative, the defendants asked that we find that they are entitled to qualified immunity. And finally, if we determined that the speech was protected and that they were not entitled to qualified immunity, the defendants asked that we reverse the award of punitive damages. At no time in the appeal did the defendants request a new trial. At no time did they argue that they would be entitled to a new trial if the jury was presented with evidence of both protected and unprotected speech. The majority states that we do not know whether the jury found the retaliation

was due to protected speech, unprotected speech or a combination of both. Even if the majority is correct that some of the speech was unprotected, that uncertainty is irrelevant. Having failed to make such an argument, the defendants waived any claim for a new trial on that basis. *See Kramer v. Banc of Am. Sec. LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004) (the absence of any supporting authority or development of an argument constitutes a waiver on appeal); *Hildebrandt v. Illinois Dep't of Natural Res.*, 347 F.3d 1014, 1025 n.6 (7th Cir. 2003) (when a party presents no argument in its brief with respect to a particular claim, any arguments with respect to that claim are waived); *Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that claims not argued on appeal are abandoned, and collecting cases). The defendants took an all or nothing approach in their appeal of the judgment in favor of Lt. Morales; they are entitled to nothing. For these reasons, I concur in the judgment with respect to Detective Kolatski and respectfully dissent from the judgment with respect to Lt. Morales.

A true Copy:

      Teste:

                      _____
                      *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*