# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 07-3126

KEVIN J. RENKEN, Doctor,

*Plaintiff-Appellant,*

*v.*

WILLIAM D. GREGORY, Doctor,
WILLIAM R. RAYBURN, Doctor,
JOHN A. WANAT, Doctor, et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04 C 1176—**Lynn Adelman**, *Judge.*

_____

ARGUED MAY 29, 2008 —DECIDED SEPTEMBER 4, 2008

_____


Before FLAUM, MANION, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Dr. Kevin Renken, a professor at the University of Wisconsin-Milwaukee ("University"), filed a complaint pursuant to 42 U.S.C. § 1983 asserting

that University officials[1] had retaliated against him for exercising his First Amendment rights when he complained about the University's use of grant funds. The district court granted summary judgment in favor of the University, and Renken appeals. We affirm.

I.

Renken is a tenured professor at the University's College of Engineering and Applied Sciences ("CEAS"). According to chapter 4.03 of the University Policies and Procedures manual, faculty members are "responsible for teaching, researching, and public service." A University faculty member's responsibilities are multi-faceted. For instance, the University evaluates a faculty member's execution of these responsibilities as well as his "professional and public service and contribution to the institution." Wis. Adm. Code § UWS 3.06(b). *See also* The University of Wisconsin-Milwaukee Policies & Procedures 3.17(1) ("Teaching, research and service are all to be considered in any judgment concerning promotion or appointment with tenure, specifically as measured by demonstrated teaching ability, professional competence, past and anticipated creative accomplishments, and contributions and

---

[1] Specifically, Renken sued Dr. William Gregory, CEAS Dean, Dr. William Rayburn, Dean of the Graduate School, Dr. John Wanat, University Provost and Vice Chancellor for Academic Affairs, and Dr. Nancy Zimpher, University Chancellor from 1998 until the end of September of 2003. For ease of reference, we will collectively refer to the defendants as the University.

service to the public, the University, and to the faculty member's profession."). Considerations for full professorship include a faculty member's grants and the projects developed from the grants. During his time at the University, Renken obtained more than $300,000 in education and research funds, including grants from the National Science Foundation ("NSF").

Renken and several of his colleagues, Professors Tracy Posnanski, Andrew Price, and John Reisel, applied for a grant from NSF for a project entitled "Establishment of Collaborative Thermal Engineering Technology Laboratory by UWM Mechanical Engineering Faculty and Undergraduate Students." The purpose of the proposal was "to develop a mechanism for enhancing the education of engineering undergraduates at [the University] through the addition of laboratory components" to courses, which, at the time of the grant application, did not have hands-on laboratory content. As noted by Dr. Al Ghobanpoor, Professor and Associate Dean of CEAS, in a letter in support of the grant application, "The laboratories will enhance the education of hundreds of students a year who take these courses." Renken was the principal investigator/project director who signed and submitted the grant proposal.[2]

---

[2] A principal investigator "is the individual designated by the grantee, and approved by NSF, who will be responsible for the scientific or technical direction of the project." NSF Grant Policy Manual § 210, http://www.nsf.gov/pubs/stis1995/nsf9526/nsf9526.txt (last visited August 20, 2008). In exchange for his

(continued...)

Among other things, Renken included a budget with the grant project proposal. In the summary budget proposal, Renken listed the requested funds, which included compensation for himself, and Professors Posnanski, Price, and Reisel, as well as compensation for undergraduate students who worked on the project and funding for materials, and supplies. The proposed faculty compensation was to cover course releases, otherwise called course buy-outs. A course release covered a reduction in a faculty member's required teaching course-load because of the demands associated with the teaching and administration related to the grant project. The proposal also listed a University salary-match for "a two-course reduction of overall teaching load in the form of research release time for each PI [(principal investigator)] during the project."

The University approved the proposal, which was submitted to NSF. NSF awarded the University a grant of $66,499.00 to support the project for a period of three years. The award was conditioned on the University providing cost-sharing funds for the project in the amount of $222,667.00.

On May 14, 2002, Dean William Gregory sent Renken and Reisel a proposal about conditions relating to the University's matching funds for the NSF grant project for them to sign. The letter stated that the original grant

---

[2] (...continued)

work as PI, Renken was to receive a reduced teaching load at the same level of pay.

proposal "was signed with the understanding that the standard practice for matching contributions applied," and set forth the proposal for the matching funds. The letter set forth a "statement of how [the University's] commitment for matching contributions for [the] proposal will be met," for equipment, salaries (course releases for PI's like Renken), and laboratory space. Signature lines designated for Renken and Reisel appeared at the bottom of the letter below the statement "I agree to the conditions noted above."

In response, Renken and Reisel sent Gregory a letter cataloguing a list of criticisms regarding the project: a lack of lab space for the project, Gregory's proposal for the use of certain funds for the labs, Gregory's decision about course releases related to the project, and the delay in paying undergraduates working on the project, and the CEAS's administration delay in processing purchase orders relating to the project and the resulting loss of certain vendors. Citing NSF instructions regarding program solicitations Renken and Reisel contended that Gregory's fund proposal contravened NSF regulations regarding matching funds. They noted throughout the letter that the grant project was educational and overloaded their normal teaching duties. Renken and Reisel concluded, "it is unclear why our signatures are needed on your letter since we do not have signature authority. In addition, we do not want to advocate the violation of the NSF regulations."

After this exchange with Gregory, Renken filed a complaint against Gregory with Dr. Ann Snyder, chair of the

University Committee. Renken cited the non-processing of the hourly contracts for undergraduates who worked on the NSF project. In Renken's opinion, the non-payment was "a vindictive action by Dean Gregory because the PIs have pointed-out inconsistencies on the part of his office."

On July 26, 2002, Gregory revised his May 14th letter, striking a portion of the original letter regarding lab space. In an accompanying memorandum, Gregory noted that Renken had been previously informed that expenditures related to the project would not be approved until Renken and Reisel signed the May 14th letter. Gregory also acknowledged Renken and Reisel's contact of the University Committee regarding the May 14th letter. Finally, Gregory notified them that a rejection of the proposal would prompt Gregory to contact the Dean of the Graduate School to initiate the cancellation of the NSF grant.

Renken did not sign Gregory's revised letter, but rather submitted a request for a course buy-out for the NSF project. On August 27, 2002, in response to Renken's request, Gregory sent Renken a letter notifying Renken that the NSF project account was not a valid account. Specifically, Gregory noted that because Renken and Reisel did not sign his July 26, 2002 letter, the University had commenced the process of returning the grant funds to NSF.

Two days later, on August 28, 2002, Renken e-mailed Judith Temby, Secretary of the University's Board of Regents, recounting the difficulties he was having with Gregory in relation to the grant project. In the correspon-

dence, Renken stated that Gregory's office had not provided the lab space or matching funds for the project, including course release funds. Among other things, Renken also informed Temby that Gregory wanted Renken and Reisel to sign off on the letter in which Renken stated Gregory was proposing using funds in violation of NSF policies. Renken stated:

> the Dean's office has harassed, discriminated against, and frustrated our educational and research activities by delaying/refusing: Personnel Action Forms for PIs and their undergraduate and graduate students, External Requisitions to purchase equipment, supplies and materials, and other expenditure items that were part of this grant and other grants not associated with this one which are directed by the Co-PIs. I find the Dean's actions unprofessional and vindictive in nature. The [University] System has no place for an individual, especially an administrator, who has little concern for the students and frustrates productive faculty members.

In a letter dated September 9, 2002, Renken also wrote Dr. Marcia Parsons, chair of the University Committee, reiterating his complaint made to Snyder, Parsons's predecessor, regarding the payment of undergraduates. Renken again sought an investigation of the non-processing of hourly contracts of undergraduate student assistants. Also in this second complaint, Renken complained about an allegedly disturbing voicemail left by another professor on Renken's answering service, and Gregory's statement that the University Committee had advised Renken and Reisel to sign the May proposal.

On November 1, 2002, the Dean of the Graduate School, William Rayburn, presented a compromise proposal to Renken and Reisel, who, in turn, rejected the compromise. At this point, the University decided to return the grant to the NSF.

Renken filed suit in the Eastern District of Wisconsin asserting a claim under 42 U.S.C. § 1983 asserting a violation of his First Amendment rights. Renken alleged that the University had reduced his pay and terminated the NSF grant in retaliation for his exercise of his First Amendment rights when he criticized and complained about the University's proposed use of the grant funds. The district court granted the University's motion for summary judgment, concluding that Renken's complaints about the grant funding were made as part of his official duties, rather than as citizen, and therefore were not protected by the First Amendment. Alternatively, the district court concluded that if Renken spoke as a citizen and not as part of his official duties, his speech was still not protected because it related to a matter of private interest, namely Renken's teaching and research, and not a matter of public concern. Renken appeals.

II.

We review a district court's grant of a motion for summary judgment de novo. *Sigsworth v. City of Aurora*, 487 F.3d 506, 508 (7th Cir. 2007). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue

of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In order for a public employee to raise a successful First Amendment claim, he must have spoken in his capacity as a private citizen and not as an employee. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Morales v. Jones*, 494 F.3d 590, 595 (7th Cir. 2007) (quoting *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006)). Determining what falls within the scope of an employee's duties is a practical exercise that focuses on "the duties an employee actually is expected to perform." *Id.* at 596 (quoting *Garcetti*, 126 S. Ct. at 1962). "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 126 S. Ct. at 1962. Only if Renken was speaking as a citizen and not as an employee, will we "inquire into the content of the speech" to ascertain whether his speech touched on a matter of public concern to determine whether it is protected speech. *Speigla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) (citations omitted).

Renken argues that the tasks that he conducted in relation to the grant were implemented at his discre-

tion "*while* in the course of his job and not as a *requirement* of his job." As a professor, Renken was responsible for teaching, research, and service to the University. In fulfillment of his acknowledged teaching and service responsibilities, Renken acted as a PI, applying for the NSF grant. This grant aided in the fulfillment of his teaching responsibilities because, as Renken notes in his reply brief, the grant was an education grant for the benefit of students as "undergraduate education development." Moreover, because of his responsibilities as PI, Renken was entitled to a reduction in his teaching course load. In his capacity as PI, Renken administered the grant by filing a signed proposal, including a budget regarding the proposed grant and University funds involved in the project, seeking compensation for undergraduate participants, applying for course releases, and noting what appeared to be improprieties in the grant administration. Renken complained to several levels of University officials about the various difficulties he encountered in the course of administering the grant as a PI. Thereby, Renken called attention to fund misuse relating to a project that he was in charge of administering as a University faculty members. In so doing, Renken was speaking as a faculty employee, and not as a private citizen, because administering the grant as a PI fell within the teaching and service duties that he was employed to perform. *See Garcetti*, 126 S.Ct. at 1960; *Tamayo v. Blagojevich*, 526 F.3d 1074, 1092 (7th Cir. 2008) (noting that an "official, in so informing the legislators [of irregularities], was discharging the responsibilities of her office, not appearing as 'Jane Q. Public.' Reporting

alleged misconduct against an agency over which one has general supervisory responsibility is part of the duties of such an office."), *Spiegla*, 481 F.3d at 967.

We note, too, that whether Renken was explicitly required to apply for grants does not address whether his efforts related to the grant, including his complaints, were a means to fulfill his employment requirements, namely teaching and research. Moreover, Renken chose to exercise whatever discretion he had in this regard. *See Morales*, 494 F.3d at 598 n.3 (7th Cir. 2007). Contrary to Renken's urging, "focus[ing] on 'core' job functions is too narrow after *Garcetti*, which asked only whether an 'employee's expressions [were] made pursuant to official responsibilities.'" *Spiegla*, 481 F.3d at 966 (quoting *Garcetti*, 126 S. Ct. at 1961).

Along the same lines of his initial argument, Renken asserts that his speech was outside his employment because it was "[s]olely by the terms of the Grant, *not* his job, [that he] was required to complain if money was taken by the University." As we have noted above, the proper administration of an educational grant fell within the scope of Renken's teaching duties at the University, so much so that he would receive a reduction in his teaching load for serving as a PI for the project. Moreover, in his affidavit filed with the district court, Renken, himself acknowledged the import of the NSF grant to his job, stating, "My grants and the projects I develop from them must be documented and are a major factor considered in earning Full Professorship at [the University]."

Renken cites *Morales v. Jones*, 494 F.3d 590 (7th Cir. 2007), in support of his contention that his speech was protected because his job duties did not extend to making formal complaints. In *Morales*, we held that the statements a police officer made to an assistant district attorney regarding the harboring of a fugitive by the chief of police was within the officer's employment, but the officer's statements on the same subject in the course of a civil lawsuit deposition were made as a private citizen. Specifically, we stated that "[b]eing deposed in a civil suit pursuant to a subpoena was unquestionably not one of Morales' job duties because it was not part of what he was employed to do." *Id.* at 598. Here, by Renken's own admission, his employment status a full professor depended on the administration of grants, such as the NSF grant. It was in the course of that administration, that Renken made his statements about funding improprieties within the confines of the University system and as the principal PI. Therefore, *Morales* does not support Renken's contention that his speech is protected.[3] Because Renken's speech is not protected, his First Amendment claim fails.

---

[3] Because Renken's speech was made as an employee and not a citizen, we need not address whether his speech addressed a matter of public concern to determine whether it not protected by the First Amendment.

### III.

Renken made his complaints regarding the University's use of NSF funds pursuant to his official duties as a University professor. Therefore, his speech was not protected by the First Amendment. The district court properly granted summary judgment in favor of the University, and we AFFIRM.